JUDGE BRIEANT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

06 CV 722

-------------------------------------------------x

ERNESTO DARQUEA,

                       **Plaintiff,**

       vs.

**JARDEN CORP., and MARTIN E.
FRANKLIN,**

                   **Defendants.**

Civil Action No.

**CLASS ACTION COMPLAINT**

-------------------------------------------------x

Plaintiff alleges the following based upon the investigation undertaken by Plaintiff's

counsel, which included analysis of publicly available news articles and reports, public filings,

securities analysts' reports and advisories about Jarden Corp. ("Jarden" or the "Company"), press

releases and other public statements issued by the Company, and media reports about the

Company, and believes that substantial additional evidentiary support will exist for the

allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action brought on behalf of a class consisting of

all persons other than Defendants who purchased Jarden securities (the "Class") from June 29,

2005 through January 11, 2006 (the "Class Period"). Plaintiff asserts claims under Section 10(b)

of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b-

5 promulgated thereunder.

2.     Jarden describes itself leading provider of niche consumer products used in and

around the home. Jarden operates in three primary business segments through three operating

divisions known as Branded Consumables, Consumer Solutions, and Outdoor Solutions. Jarden, headquartered in Rye, New York, has been run by defendant Martin E. Franklin ("Franklin"), its Chairman and Chief Executive since September 2001.

3.      Defendant Franklin has built his career as a "corporate aggregator"--i.e., a corporate executive who merges small companies with similar or complementary product lines in order to build what is hoped to be a larger and more formidable business competitor.  He has followed this pattern during his stewardship at Jarden.  The Company has grown from $368 million in revenues in 2002 (Franklin's first full year at the helm) to annualized revenues of $3.5 billion.

4.      Much of Jarden's revenue growth is attributable to two acquisitions completed in 2005: American Households Inc. (the previously bankrupt Sunbeam Corp.) and Holmes Group Inc., a consumer products company which makes and distributes popular home products, including the Crock Pot slow cooker and Rival brand kitchen wares.

5.      The acquisition of American Households, Inc. ("AHI"), originally announced in September 2004, placed a considerable strain upon Jarden.  At the end of 2004 Jarden had working capital of slightly more than $200 million, but was required to come up with the resources to pay AHI's former owners and creditors $845.6 million to complete the acquisition, which would triple Jarden's revenue.  To do so, defendant Franklin constructed a peculiar financing package which had as its cornerstone the sale of $350 million worth of convertible preferred stock (the "Convertible Preferred") to private equity firms Warburg Pincus LLC ("Warburg") and Catterton Partners ("Catterton").  Without this stock sale it is unlikely that Jarden could have raised the sum necessary for the AHI acquisition solely from traditional funding sources.

2

6.     The Convertible Preferred stock was sold on onerous terms.  Jarden was forced to pay the Convertible Preferred investors stock dividends (which diluted the common stockholders, including Franklin), cede a degree of managerial control and oversight to the Convertible Preferred investors' Board of Directors designee, and repay the Convertible Preferred on a schedule which had the potential to interfere with Franklin's ambitious long-term acquisition plans.  Franklin knew that the quickest way to escape these constraints was to force the conversion of some or all of the Convertible Preferred stock into common stock.  Under the terms pursuant to which the Convertible Preferred stock was sold a conversion could only be forced if Jarden's stock increased considerably.

7.     On June 23, 2005, defendant Franklin entered into a new employment agreement which bestowed extraordinary benefits on him personally, which would partly vest if Jarden's stock rose above the contractual target price needed to force the conversion of the Convertible Preferred stock.  Pursuant to this new employment agreement, Franklin received a grant of up to 915,000 shares of Jarden stock. Half of the 915,000 shares (457,500 shares) would vest on November 1, 2005 if, prior to that time, Jarden's stock rose to $56 per share over a certain number of trading days, and the other half if the stock rose to $64 per share. At the time this new employment agreement was signed, Jarden's closing stock price was $51.34 per share, making the first tranche of 457,500 shares worth approximately $23.5 million.  If these shares vested when the stock price hit $56 per share (and remained there for a number of days), Franklin stood to walk away with stock worth approximately $25.6 million, *which was almost 14 times Franklin's annual base salary.*  Thus, if Franklin could cause this increase quickly, he stood to earn 14 years' worth of base salary in a matter of only four months.  Franklin thus had an extraordinary incentive to boost Jarden's stock price, although his legal obligation was to do so

3

through wholly lawful means. As detailed below, Franklin instead turned to unlawful misrepresentations and omissions, which artificially inflated Jarden's stock price, and earned Franklin the aforementioned tens of millions of dollars worth of stock.

8.      Six days after Franklin entered into this new employment agreement, he announced Jarden's acquisition of Holmes. In order for this acquisition to be well-received, Franklin knew that the Holmes acquisition had to be viewed with enthusiasm by the investment community. In a teleconference held on June 29, 2005 (the start of the Class Period), Franklin delivered the good news that the Holmes acquisition would greatly increase Jarden's revenues and improve its profit margins (as measured by "EBITDA"--earnings before deductions for interest, taxes, depreciation, and amortization). Franklin misled investors in several ways during this call. He emphasized Holmes' historical EBITDA margins, including EBITDA in 2004 of $95 million, while failing to reveal that Holmes had no reasonable way to repeat that performance in 2005 due to the loss of tens of millions of dollars in revenue from a deal Holmes had with Procter & Gamble. Instead, Franklin presented this serious situation as if it were not a concern. Moreover, Franklin failed to reveal that, in order to present the types of numbers and business improvements that would catapult Jarden's stock price he had merely accepted the financial projections put together by Holmes' selling shareholders, without making the adjustments an experienced buyer would ordinarily make to such projections to eliminate "seller's hyperbole." Franklin knew, or recklessly disregarded, that blindly accepting the sellers' numbers and representations was absurd, but did so anyhow so as to cause Jarden's stock price to leap, force the conversion of all or part of the Convertible Preferred, and earn the extraordinary bounty provided him by the employment contract entered into just days before.

4

9.     Based on Franklin's false representations, the Holmes acquisition was met with enthusiasm by analysts and investors. On June 29, 2005, Jarden's price rose to $55.20 per share from the previous day's close of $50.22 per share. As the market absorbed the good news, the stock continued to climb, reaching $59.96 per share by July 8, 2005.

10.     On August 8, 2005, Jarden announced that it had achieved its goal of forcing the conversion of the Convertible Preferred stock.    On November 1, 2005, Franklin's aforementioned 475,500 shares of restricted stock vested. This stock on that date was worth approximately $25 million. In the months following the Holmes acquisition and before the end of the Class Period, Franklin also sold shares into the open market at inflated prices, grossing more than $7.6 million in proceeds.

11.     Franklin continued to maintain the façade that the Holmes acquisition was as represented until Jarden's fourth quarter ended on December 31, 2005, at which point the scheme collapsed.  Holmes did not replace the business it had lost from Procter & Gamble (there had never been any practical way to do so), and its EBITDA fell from $95 million to about $80 million, a material decline of 15.8%. Upon the announcement of this bad news on January 11, 2006 (the end of the Class Period), Jarden's stock (which had split on a 3 shares for every 2 shares basis on July 12, 2005), fell $3.37, or 12% per share, to a price of $27.05 per share. Franklin's incredible explanation for this shocking shortfall was that: "the original forecasts for Holmes *provided to us* at the time of the acquisition were overoptimistic." (Emphasis added). This is the first time the market learned that Franklin's previous statements were based on biased forecasts provided by the self-interested sellers of the Holmes business.   Franklin knew or recklessly disregarded that such forecasts were inherently unreliable, but he accepted them blindly so that he could convert the onerous Convertible Preferred stock and, most importantly

5

from his personal perspective, collect $25 million in stock compensation in just four months' time.

12.      When the bad news about Holmes was revealed on January 11, 2006, the holders of Jarden's 67.9 million outstanding shares lost over $228 million in market value.  At the close of the Class Period, Jarden shareholder's held shares that were trading at 10% *below* where they were just one year before.  Defendant Franklin, however, through fraud and deceit, prospered handsomely in that same year, receiving over $35 million in compensation through stock grants, salary, and stock sales.

13.      For the foregoing reasons, Plaintiff and the Class seek damages from Franklin and Jarden for violations of the federal securities laws.

## JURISDICTION AND VENUE

14.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20 of the Exchange Act (15 U.S.C. §§78j(b) and 77t), and SEC Rule 10b-5, 15 C.F.R. § 240.10b-5.

15.      This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §§1331 and 1337.

16.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District.

17.      In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange (the "NYSE"), a national securities exchange.

## PARTIES

18.    Plaintiff Ernesto Darquea purchased Jarden's securities during the Class Period, as described in the attached certification, annexed hereto as Exhibit A, and was damaged thereby.

19.    Defendant Jarden is a Delaware corporation and maintains its principal executive offices at 555 Theodore Freund Avenue, Rye, New York 10580. . Jarden is a leading provider of niche consumer products used in and around the home. Jarden operates in three primary business segments through three operating divisions known as Branded Consumables, Consumer Solutions, and Outdoor Solutions.  Traded on the New York Stock Exchange under the symbol "JAH," Jarden had as of September 30, 2005 67,945,733 common shares outstanding.  The Company is followed by a number of investment analysts, and its shares are actively traded.

20.    Defendant Franklin was, at all relevant times, Chairman of Jarden's Board of Directors and its Chief Executive Officer, positions he had held since September 2001.  Under his present employment agreement, Franklin is paid a base salary of $1.84 million per year, and is eligible for an annual bonus, and restricted stock awards under the Company's 2003 Stock Incentive Plan.

21.    By reason of his management position and ability to make public statements in the name of Jarden, Franklin had the power and influence to cause (and did cause) Jarden to engage in the conduct complained of herein.  Franklin had access to the adverse non-public information about the Company's business, finances, products, markets and present and future business prospects, as particularized herein, by means of internal corporate documents, conversations or connections with corporate officers or employees, attendance at Company management and/or

Board of Directors meetings and committees thereof, and/or reports and other information provided to each in connection therewith.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

22.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of himself and all persons who purchased the securities of Jarden from June 29, 2005 through January 11, 2006.  Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

23.    The members of the Class are so numerous that joinder of all members is impracticable.  Jarden's approximately 68 million shares of common stock traded actively during the Class Period.   The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Jarden or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

24.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

25.    Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

26.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

27.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.    Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein, including affirmative misrepresentations and omissions;

(b)    Whether Defendants had a duty to update or correct certain statements made about Jarden, and failed knowingly or recklessly to fulfill this duty; and

(c)    The extent of injuries sustained by members of the Class and the appropriate measure of damages.

## FACTUAL ALLEGATIONS

28.     Jarden began its corporate life as a public company in 1993 as a metal and plastics maker known as Alltrista Corporation.  Franklin and his business partner, Ian Ashken (who is now Jarden's CFO) first acquired an economic interest in Alltrista in 2000.  Franklin took the helm of Alltrista in September 2001, jettisoned its traditional businesses, and refocused it on the sale of branded consumer products.  Franklin's long-term plan was to turn the company (soon re-named Jarden Corp.) into a powerhouse by making strategic acquisitions.  The first such acquisition was Tilia International, Inc., which was acquired in 2002 for $160 million. For all of 2002, Jarden reported $368 million in revenues and $36 million in net income.

29.     More acquisitions were completed in 2003. For that year, Jarden reported $587 million in revenues, and net income of $32 million.  In 2004, Franklin turned his eye toward his most ambitious acquisition yet: the purchase of the product lines of the once bankrupt Sunbeam Corp., then known as American Households Inc. ("AHI").  The acquisition would be costly, $845.6 million, and such a price tag placed the deal largely beyond Jarden's traditional bank sources of funding.  Instead, Jarden opted to sell a large block of Convertible Preferred stock to two private equity firms, raising $350 million.  Of this sum, $300 million was sold to Warburg Pincus (which was granted board representation and other controls over the company), and $50 million was purchased by Catterton Partners.  This financing, which was made the subject of a formal contract in September 2004, came with onerous terms.  The Convertible Preferred was entitled to be paid dividends in common stock (which at certain point would be increased substantially every six months), which meant dilution for Franklin and other common shareholders.  In addition, the Convertible Preferred holders could convert their shares at inopportune times or, at a certain point, seek payment at a disadvantageous "base liquidation

value." Jarden could force the holders to convert to common shares if the stock rose to $56 per share, and stayed there on an average basis for a set number of days.

30.     With funding in place, Jarden announced the acquisition agreement with AHI on September 20, 2004. In a press release issued that day, Franklin stated:

> We are delighted to add the renowned products of the American Household portfolio to our growing business, which will allow us to extend our market positions while tapping new strategic sectors. It is expected that this transaction will bring immense benefits to the company, our customers and employees by expanding our operating platform, both internationally and domestically, and by broadening and diversifying our product lines through superior cross-selling, retail distribution and licensing enhancements.

31.     The AHI acquisition closed on January 24, 2005.  In the ensuing months, Franklin was faced with integrating AHI's operations into Jarden, and developing an approach to eliminate the overhang of the Convertible Preferred stock through an increase in the stock price. Although Jarden's traditional businesses were profitable, they were characterized by low profit margins, generally below 10%.  Acquisition of a high profit margin business would send the stock soaring, so long as those margins were achievable.

32.     In or about May 2005, Franklin entered into serious acquisition talks with the founder and investors in Holmes, a Massachusetts consumer products company which, in 2004, had posted $1.5 billion in revenues, and high profit margins based on adjusted EBITDA of $95 million (prior to adjustments, EBITDA was $120 million). During the course of the negotiations, the sellers presented Franklin with projections containing the numbers he needed to excite investors about the acquisition; they showed a repeat of the $95 million in adjusted EBITDA, despite the loss to Holmes of a major source of revenue.  That source was a lucrative contract to make and distribute a Procter & Gamble household fragrance product known as "Scentstories." Franklin accepted the sellers' projections without the usual skepticism that would be applied to such figures because he knew or recklessly disregarded that adjustments to reflect objective

11

reality would not likely produce the stock gains he needed to achieve to accomplish two important goals--forced conversion of the onerous Convertible Preferred, and a huge and extraordinary stock payment to himself for as compensation for that accomplishment.

33.    Toward the end of June 2005, Jarden and Holmes were nearing a final agreement, and Franklin entered into negotiations with Jarden's Board on his own behalf. The result of Franklin's personal negotiations was an amended employment contract dated June 23, 2005. The contract provided for a grant to Franklin of a mind-boggling 915,000 shares of restricted stock, which would vest in two tranches. Each tranche was tied to certain performance targets. Tranche One (which consisted of 475,500 shares) would vest if Franklin could boost the stock to $56 per share, the exact price at which Jarden could forcibly convert the Convertible Preferred stock. Tranche Two (containing the second 475,500) would vest if the stock rose even higher, to $64 per share. If the targets were achieved, the stock could vest as early as November 1, 2005. Even earning the shares in Tranche One would be of enormous personal benefit to Franklin. Franklin's annual salary was $1.84 million per year. Vesting of the Tranche One shares by November 1, 2005, about four months later, would provide Franklin with about $25.6 million in stock, almost 14 times his annual salary. Thus, Franklin had a unique and concrete motive to enhance the stock price.

34.    On June 29, 2005, the start of the Class Period, Jarden announced that it had agreed to acquire Holmes. In a press release issued that day, Jarden stated, in relevant part:

> Jarden Corporation (NYSE:JAH), a leading global provider of niche branded consumer products, announced today a definitive agreement to acquire privately-held The Holmes Group, Inc. ("Holmes") in a transaction valued on a debt free basis at approximately $625 million, consisting of approximately $420 million in cash and 4.1 million shares of Jarden common stock. Holmes is a leading manufacturer and distributor of select home environment and small kitchen electrics under well-recognized consumer brands...
> The transaction is expected to be immediately accretive to earnings and close during the third quarter, subject to customary closing conditions.

Founded in 1982, Holmes supplies consumer products for the home environment and kitchen markets. Holmes' established relationships with major customers and its new product development expertise has enabled it to secure leading market positions across major product categories on a global basis, including Crock-Pot(R) slow-cookers, Rival(R) roasters and deep fryers, and Bionaire(R) air purifiers and seasonal humidifiers.

Holmes has annual revenues of approximately $700 million and an adjusted non-GAAP EBITDA of approximately $95 million. Based on a $625 million enterprise value for the business, the acquisition multiple is approximately 6.5 times the adjusted non-GAAP EBITDA run rate, before any synergies.

Due to the share issuance related to the Holmes transaction, the Company's Board has approved a stock repurchase program of one million shares. Jarden intends to buy back up to one million shares of Jarden common stock in the second half of 2005, which is expected to be funded from free cash flow generated during this same period.

35.     In that same press release, Franklin stated:

Today's announcement represents another important step in Jarden's long-term plan to grow and diversify our portfolio of niche branded consumer products into a world class consumer products company. Holmes' premier brands, leading market shares in their respective niche markets and robust international operations fit well with our established operating criteria. In fact, given the complementary nature of the businesses and compelling rationale for a combination, Holmes had numerous meetings in the past several years to discuss a strategic combination with American Household, prior to its acquisition by Jarden. With its history of strong earnings, margins and cash flow, Holmes is expected to be a positive addition to Jarden's growing product mix. In addition, we are acquiring a talented workforce with a proven track record of maintaining margin discipline, while supporting their brands and new product development in order to grow the top line organically.

36.     In a conference call held that same day, both Franklin and CFO Ashken expressed exuberance about the acquisition, and the profit margins Holmes would bring to Jarden.  Such profit margins would help Jarden enormously because Jarden had posted margins in 11% range on a *pro forma* basis, while Holmes had enjoyed higher margins, based on $95 million in EBITDA in 2004 (adjusted downward to exclude certain items from $120 million).  During that call Franklin emphasized Holmes' high gross margins, and then asked CFO Ashken to convey Jarden's bullish projection, which was contrary to Jarden's previous policy of not making projections. Franklin stated:

13

From a financial as well as operational perspective we believe that the Holmes acquisition is extremely attractive for our existing and new shareholders. The transaction further diversifies our product offerings giving us annualized revenue run-rate of approximately $3.4 billion. The gross margins are similar to our existing business at 27% but the transaction will help improve the time line we established for following the American Household acquisition of returning Jarden to 15% + EBITDA margins within the next three to five years. It is not a usual custom to give guidance to the street. But with June drawing to a closing and given the size of this transaction, I have asked Ian to give you a brief overview of Jarden's Q2 outlook and the impact of the Holmes transaction on earnings for 2005.

37.    CFO Ashken then continued, in relevant part:

The Holmes transaction should offer a number of synergies. We have not fully quantified these yet, but are comfortable that we will achieve at least $15 million of cost savings within the next 24 months. This will further help to expand margins. Holmes's historical adjusted EBITDA margins of 13 to 14% will help Jarden drive towards its overall EBITDA margins.

38.    At no point during the conference call did either Franklin or Ashken convey that their optimism was based upon accepting the business plan and projections assembled by the sellers during their negotiations to purchase Holmes.  Such a revelation would have been astonishing since such conduct would not be expected of novice managers, let alone experienced and savvy executives like Franklin and Ashken.  Nor did these executives explain the extraordinary difficulties Holmes would face in replacing the lucrative Procter & Gamble business.  Over the next several months, Jarden and Franklin remained silent as Holmes fell short of the promises they made, found its business disrupted by the acquisition, and sold lower margin products than the sellers' plan had called for.  The defendants' representations led to an artificially inflated stock price, and their subsequent silence (even though they had a duty to update and correct previous statements) enabled the stock price to remain at inflated prices.

39.    Franklin's representations in connection with the Holmes acquisition had the desired effect. On June 29, 2005, Jarden's price rose to $55.20 per share from the previous day's

14

close of $50.22 per share. As the market absorbed the good news, the stock continued to climb, reaching $59.96 per share by July 8, 2005.

40.     On August 8, 2005, Jarden announced that it had achieved its goal of forcing the conversion of the Convertible Preferred stock.   On November 1, 2005, Franklin's aforementioned 475,500 shares of restricted stock vested. This stock on that date was worth approximately $25 million. In the months following the Holmes acquisition and before the end of the Class Period, Franklin also sold shares into the open market at inflated prices, grossing more than $7.6 million in proceeds.

41.     Franklin continued to maintain the façade that the Holmes acquisition was as represented until Jarden's fourth quarter ended on December 31, 2005, at which point the scheme collapsed. Holmes did not replace the business it had lost from Procter & Gamble (there had never been any practical way to do so), and its EBITDA fell from $95 million to about $80 million, a material decline of 15.8% (or 33% based on the unadjusted EBITDA of $120 million). Upon the announcement of this bad news on January 11, 2006 (the end of the Class Period), Jarden's stock (which had split on a 3 shares for every 2 shares basis on July 12, 2005), fell $3.37, or 12% per share, to a price of $27.05 per share. Franklin's incredible explanation for this shocking shortfall was that: "the original forecasts for Holmes *provided to us* at the time of the acquisition were overoptimistic." (Emphasis added). This is the first time the market learned that Franklin's previous statements were based on biased forecasts provided by the self-interested sellers of the Holmes business. Franklin knew or recklessly disregarded that such forecasts were inherently unreliable, but he accepted them blindly so that he could convert the onerous Convertible Preferred stock and, most importantly from his personal perspective, collect $25 million in stock compensation in just four months' time.

42.    When the bad news about Holmes was revealed on January 11, 2006, the holders of Jarden's 67.9 million outstanding shares lost over $228 million in market value.  At the close of the Class Period, Jarden shareholder's held shares that were trading at 10% *below* where they were just one year before.  Defendant Franklin, however, through fraud and deceit, prospered handsomely in that same year, receiving over $35 million in compensation through stock grants, salary, and stock sales.

43.    Defendants had a duty to update or correct previous prognostications, and to provide prompt notice to investors of adverse developments. Not only did Defendants fail in this duty, but they made numerous affirmative misrepresentation and omissions, designed to mislead the public.  The Defendants were motivated to do this because they wanted the Company's stock to remain as high as possible during the period that the Company was forcibly converting the Convertible Preferred stock, and Franklin was securing his extraordinary stock compensation, and proceeds from open market sales.

44.    Based on the foregoing, Defendants herein repeatedly misled Plaintiff and all class members, and are liable for violations of the Exchange Act.

## SCIENTER ALLEGATIONS

45.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

46.    Defendants knew and/or recklessly disregarded the falsity and misleading nature

of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this Complaint could not have been perpetrated without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## FRAUD ON THE MARKET PRESUMPTION

47.    At all relevant times, the market for Jarden securities was an efficient market for the following reasons, among others:

(a)    Jarden stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient market;

(b)    As a regulated issuer, Jarden filed periodic public reports with the SEC and the New York Stock Exchange;

(c)    Jarden regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Jarden was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

48.    As a result of the foregoing, the market for Jarden securities promptly digested current information regarding Jarden from all publicly-available sources and reflected such information in Jarden's stock price. Under these circumstances, all purchasers of Jarden

17

securities during the Class Period suffered similar injury through their purchase of Jarden securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

49.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Jarden who knew that those statements were false when made.

## LOSS CAUSATION

50.     Defendants' wrongful conduct, as described herein, directly and proximately caused the damages suffered by the Plaintiff and the Class.

51.     During the Class Period, Plaintiff and the Class purchased shares at artificially inflated prices.  The price of Jarden stock declined as a consequence of the direct or indirect disclosure of the information misrepresented and omitted during the Class Period.

## CLAIM FOR RELIEF
### Against All Defendants for Violations
### of Section 10(b) of the Exchange Act

52.    Plaintiff incorporates by reference and realleges each of the foregoing paragraphs.

53.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Jarden securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

54.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Jarden securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55.    Defendants directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a course of conduct to conceal adverse material information about the business, operations and future prospects of Jarden as specified herein.

56.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Jarden's value and

performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Jarden and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Jarden securities during the Class Period.

57.   The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) these Defendants were high-level executives at the Company during the Class Period and a member of the Company's management team; (ii) by virtue of their responsibilities and activities as senior officers of the Company, they were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) they enjoyed significant personal contact and familiarity with other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) they were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

58.   The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Jarden's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

As demonstrated by Defendants' misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

59.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Jarden securities was artificially inflated during the Class Period.   In ignorance of the fact that market prices of Jarden's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Jarden securities during the Class Period at artificially high prices and were damaged thereby.

60.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.   Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the IPTV contract problems that Jarden was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Jarden securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

60.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule l0b-5 promulgated thereunder.

21

61.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## JURY DEMAND

Plaintiff hereby demands a jury trial.

DATED: January 30, 2006

Respectfully Submitted,

**PASKOWITZ &ASSOCIATES**

By: _____
Laurence D. Paskowitz, Esq. (LP-7324)
60 East 42nd Street—46th Floor
New York, New York 10165
Telephone: (212) 685-0969
Facsimile: (212) 685-2306

Classattorney@aol.com

Roy L.  Jacobs, Esq. (RLJ-0286)
**ROY JACOBS & ASSOCIATES**
60 East 42nd Street
46th Floor
New York, NY 10165
Telephone: (212) 867-1156
Facsimile:  (212) 504-8343

Rljacobs@pipeline.com

# EXHIBIT A

# EXHIBIT A

## PLAINTIFF'S CERTIFICATE

Ernesto Darquea ("Plaintiff"), declares, as to the claims asserted under the Federal Securities laws, that:

1.  Plaintiff has reviewed the complaint against Jarden Corp. ("JAH"), and certain other defendants, and authorizes its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

5.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6.  Plaintiff has made no transaction(s) during the Class Period in JAH common stock, except those set forth below:

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| Date(s) | Number of Shares | Price | | Date(s) | Number of Shares | Price |
| 7/28/05 | 50 | $38.90 | | None | | |

7.  During the three years prior to the date of this Certification, Plaintiff has not moved to serve as a representative party for a class in an action filed under the federal securities laws.

I declare under penalty of perjury, under the laws of the United States, this 29th day of January 2006 that the information above is accurate.

_Ernesto Darquea_

Ernesto Darquea