UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
_____ x
ERNESTO DARQUEA,                    :    Civil Action No. 7:06-cv-00722-CLB
                                    :    (Consolidated)
                   Plaintiff,       :
                                    :    CLASS ACTION
        vs.                         :
                                    :
JARDEN CORP., et al.,               :
                                    :
                   Defendants.      :
_____ x
```

 

      Lead Plaintiffs Imperial County Employees' Retirement System ("Imperial County") and

the Construction Industry and Laborers Joint Pension Trust and City of Pontiac Policeman's and

Firemen's Retirement System ("Construction Retirement Group," and collectively with Imperial

County "Lead Plaintiffs") individually and on behalf of all other persons similarly situated allege

the following based upon personal knowledge as to themselves and their own acts, and

information and belief as to all other matters, based upon *inter alia,* the investigation conducted

by and through their attorneys, which included, among other things, a review of the public

documents and announcements concerning Jarden Corporation ("Jarden" or the "Company"),

United States Securities and Exchange Commission ("SEC") filings, interviews with former

employees of Jarden, wire and press releases published by and regarding Jarden, and information

readily available on the Internet.  Lead Plaintiffs believe that substantial evidentiary support will

exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of all those persons who purchased or otherwise acquired the common stock of Jarden between June 29, 2005 and January 11, 2006 inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violation of  the Securities Exchange Act of 1934, 15 U.S.C. § 78 (the "Exchange Act"). Defendants are Jarden, its Chairman and Chief Executive Officer ("CEO") Martin E. Franklin ("Franklin"), its Vice Chairman, Secretary and Chief Financial Officer ("CFO") Ian G. H. Ashken ("Ashken," and together with Franklin, the "Individual Defendants"), in their capacity as officers and directors of Jarden, and Jarden's wholly owned subsidiary Jarden Consumer Solutions ("JCS").

2.      During the Class Period, Jarden represented itself as a leading, global provider of a diverse array of consumer products typically used in and around the home, including home canning jars (under brands such as Ball® and Kerr®), rope and cordage (Lehigh®), kitchen appliances and accessories (FoodSaver®, VillaWare®, Sunbeam®, Oster®, Mr. Coffee®, Heath o Meter®, First Alert®), household consumables, such as matches, touthpicks, plastic cutlery and playing cards (Diamond®, Forster®, Bee®, Bicycle®, Hoyle®), and camping/outdoor products (Coleman®, Campingaz®).

3.      Jarden's high profile, market leading position was largely gained through an aggressive growth by acquisition business strategy, initiated by Defendants Franklin and Ashken. The Company, previously known as the "Alltrista Corporation" before its name change to Jarden in 2002, was a relatively undistinguished maker of home food preservation products which included home canning jars, jar closures and related food products, with other product lines including thermoform plastics and zinc products including copper plated zinc penny blanks for

2

the U.S. Mint, cans for use in zinc/carbon batteries, zinc strip and a line of industrial zinc products.

4.      Jarden, while not a household name, began acquiring many household brands following the Company's change in leadership.  In 2000, Defendants Franklin and Ashken launched a hostile takeover bid, intending to buy the Company and take it private, leading a partnership that bought 9.9% of Alltrista's shares.  As a result, Franklin was given two seats on the Company's Board in June, 2001.  Thereafter, interested by Defendant Franklin's aggressive growth through acquisition and reorganization plans for the Company, Franklin was made the Company's CEO, and Ashken was made CFO, provided they agreed to keep the Company public.

5.      On January 24, 2005, Jarden stepped outside of its acquisition strategy of adding smaller companies to build a portfolio of brands including Crawford®, Diamond®, Forster®, Hoyle®, Kerr®, VillaWare® and K2®, dubbed by one analyst as a "Pac-Man-style" acquisition strategy, with the costly acquisition of the former Sunbeam Corporation, newly emerged from bankruptcy as American Household Incorporated ("AHI") for $846 million.

6.      The AHI acquisition was financed in part by a private equity transaction for a capital infusion of $350 million, which required Jarden to create new classes of in-kind dividend paying preferred stock, the appointment of a designated representative on Jarden's Board, and by its terms and conditions, restricted Jarden's ability to raise additional funds for any future acquisitions.[1]

---

[1]  However, the terms of the private equity transaction provided for the mandatory conversion of the preferred stock to common stock which did not pay a dividend, and released Jarden from the additional obligations related to the preferred stock, so long as the Company's common stock traded at a greatly increased price, for a specified period of time.

7.     Additional funds needed for the AHI acquisition were made up through Jarden's refinancing of its existing debt, which required the Company to maintain certain debt to cash flow ratios in order to remain in compliance with the credit agreement, keyed to Jarden's Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"), which is essentially the income that a company has free for interest payments.

8.     Following the costly AHI acquisition, in July 2005, Defendants were approached by the owners of privately held Holmes Group to acquire the company and its product brands including Crock-Pot® slow-cookers, Rival® roasters, and Bionaire® air purifiers, and combine the business with JCS.  Andy Hill, AHI's former president, and now president and CEO of JCS was already familiar with Holmes through discussions that arose out of AHI's interest in acquiring Holmes.  According to Defendant Franklin, management at AHI had met on numerous occasions with Holmes in the prior years to explore a combination.  Based on the familiarity with Holmes' business and management gained through the addition of AHI and the product and management synergies presented, Jarden pursued the acquisition of Holmes.

9.     As Defendant Franklin stated on June 29, 2005, the first day of the Class Period, during a teleconference with analysts addressing the Holmes acquisition:

> As maintained earlier the Holmes transaction met all of our key acquisition criteria.  A number of its brands are synonymous with the categories they serve and while some of these categories may be relatively mature, Holmes has continued to innovate in the market, driving consumer interest while protecting margins.  The business has impressive cash flows in the second half of the year and the management team is strong, experienced and eager for the opportunity to take Holmes brands to the next level.  Importantly, Holmes has a similar entrepreneurial [cultural] culture to that of Jarden, which bodes well for maximizing the synergistic opportunities the transaction will create.

10.    However, product and management synergies between Jarden and Holmes did not exist as Defendants represented to the market.  As reported by former Holmes employees,

shortfalls within Holmes' aggressive sales and revenue projections were occurring well before the acquisition was finalized, and continued throughout the Class Period.  Defendants' representations throughout the Class Period to the contrary were materially false and misleading, as Defendants knew of or recklessly disregarded the specific reports and information available and provided to JCS management which indicated Holmes would not meet its cash flow projections.

11.     Defendants Franklin and Ashken were aware that Jarden's stock price was artificially inflated by their materially false and misleading statements during the Class Period concerning the success of the Holmes acquisition, and indeed capitalized on that knowledge. Soon after the start of the Class Period when Jarden announced the acquisition of Holmes Group, Defendant Franklin sold $4.8 million of his personal holdings in Jarden.  At the same time, Defendant Ashken sold over $5 million worth of his shares in the Company.  Within days of Jarden's Analyst Day meeting held on November 2, 2005, where Defendants assured analysts that the Company – and Holmes, would make its 4Q and year end projections, Franklin sold over $2.85 million worth of his shares in Jarden, and Ashken sold shares worth over $1.1 million.

12.     It is against this backdrop that Defendants' Class Period statements and conduct must be viewed.   Defendants materially misled the market in order to artificially inflate the Company's stock, specifically misleading the market as to the projected contribution to EBITDA by the newly acquired Holmes Group.  In so doing, the Individual Defendants gained millions of dollars in incentive payments keyed to Jarden's stock price performance and sold large portions of their personal holdings in Jarden common stock generating millions of dollars of proceeds.

13.     As Jarden stated in its Form 8-K/A filed July 28, 2005, EBITDA is a significant benchmark for the Company's performance.

EBITDA is presented in the earnings conference call because the Company's credit facility and senior subordinated notes contain financial and other covenants which are based on or refer to the Company's EBITDA.  Additionally, EBITDA is a basis upon which our management assesses financial performance and we believe it is frequently used by securities analysts, investors and other interested parties in measuring the operating performance and creditworthiness of companies with comparable market capitalization to the Company, many of which present EBITDA when reporting their results.  Furthermore, EBITDA is one of the factors used to determine the total amount of bonuses available to be awarded to executive officers and other employees.  EBITDA is widely used by the Company to evaluate potential acquisition candidates.  Adjusted EBITDA, excluding purchase accounting adjustments for manufacturer's profit in inventory, reorganization and acquisition—related integration costs and loss on early extinguishment of debt, is represented in the earnings conference call because it is a basis upon which the Company's management has assessed its financial performance in the years presented.  Additionally, the Company's credit agreement has provided for manufacturer's profit in inventory adjustments required for purchase accounting, reorganization and acquisition—related integration costs and loss on early extinguishment of debt to be excluded in calculations used for determining whether the Company is in compliance with certain credit agreement covenants.

14.     Defendants' scheme unraveled when Defendants could no longer conceal that Jarden would miss its EBITDA projections for 4Q 2005 for the newly acquired Holmes Group. On news of this, shares of Jarden fell $3.37 per share, or 11.08 percent, to close at $27.05 per share on January 12, 2006.

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

17.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, the Company maintains a principal executive office in this Judicial District.

18.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national Securities exchange.

## THE PARTIES

19.     By order of this Court on June 9, 2006, Plaintiffs Imperial County and Construction Retirement Group were appointed to serve as lead plaintiffs in this action.  Lead Plaintiffs purchased Jarden common stock during the Class Period, as set forth in their respective certifications which were previously filed in this litigation and are incorporated herein by reference, and have suffered substantial damages.

20.     Defendant Jarden is a Delaware corporation that maintains its principal executive offices at 555 Theodore Fremd Avenue, Suite B-302, Rye, New York 10580.  The Company, previously known as the Alltrista Corporation ("Alltrista"), was a wholly owned subsidiary of the Ball Corporation, which was spun off in 1993 to hold the assets of seven of Ball's smaller subsidiaries.  Allistra changed its name to Jarden in 2002.  At all relevant times, the Company's shares traded on the New York Stock Exchange ("NYSE") under the trading symbol "JAH." The Company operates three primary business segments: Branded Consumables, Consumer Solutions, and Outdoor Solutions.

21.     Defendant JCS owns and operates the acquired businesses of AHI and Holmes Group.  Andrew C. Hill ("Hill") is the president and CEO of JCS.  JCS is a Delaware corporation that maintains its principle executive offices at 2381 Executive Center Drive, Boca Raton, Florida 33431.

22.     Defendant Martin E. Franklin ("Franklin") is and was at all relevant times the Company's Chairman and CEO.  Franklin signed Jarden's Form S-3s, Form S-8s and certified the accuracy of the Company's financial statements and filings with the SEC during the Class Period as required pursuant to Rule 13a-14(a) as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act").

23.     Defendant Ian G. H. Ashken ("Ashken") is and was at all relevant times the Company's CFO and Secretary.  During the Class Period, Ashen signed Jarden's Form 10-Qs and Form S-3s, Form S-8s filed with the SEC and certified the accuracy of the Company's financial statements as required under the Sarbanes-Oxley Act.

24.     During the Class Period, each of the Individual Defendants, as senior executive officers of Jarden, were privy to non-public information concerning Jarden's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board of Directors meeting and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

25.     Each of the Individual Defendants is liable as a direct participant with respect to the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company and JCS to engage in the unlawful conduct complained of herein.  Because of their position of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Jarden's business.

26.     Defendant Jarden, by reason of its status as the parent company of wholly owned subsidiary JCS, was a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause JCS to engage in the unlawful conduct complained of herein.  Because of the Company's position of control, the Company was able to and did, directly or indirectly, control the conduct of Jarden's JCS business.

27.     The Individual Defendants, because of their positions with the Company, were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

**At the Time Of The Holmes Acquisition Holmes Was Experiencing Declining Demand For Its Products And Was Not Meeting Its Internal Sales Projections**

28.     As detailed further herein, at the time of the Holmes acquisition, unbeknownst to investors, Holmes was not meeting its internal sales projections and was vastly overstating its sales projections for 4Q05.  Accordingly, Defendants' Class Period positive statements concerning the "synergies" and benefits that Jarden would derive from the Holmes acquisition were lacking in a reasonable basis at all times and, therefore, materially false and misleading.

29.     According to a Vice President and General Manager employed by Holmes for several years preceding and following the acquisition by Jarden ("W1"), by the time the Holmes acquisition was announced in June 2005, Holmes' internal sales projections were no longer "realistic," because in the first half of 2005, Holmes had already missed their projections by about $20 million.  In fact, in March of 2005, according to W1, Holmes' CFO John Kelliher required the Holmes' Vice Presidents to reevaluate their sales projections which preceded a "discovery" period in April/May of 2005, when Jarden conducted an "audit" of Holmes, which included questions about the financials for W1's division, including profit and loss statements.

30.     W1 reported directly to Holmes' CEO and founder, Jerry Kahn and oversaw an entire domestic division as VP and was responsible for product development, marketing, and production, involving all facets of W1's respective division.  As the leader of a division, W1 was privy to sales projections for the entire company and the projections were circulated among division heads on a monthly basis.  In addition, W1 attended monthly meetings where these sales projections were discussed at length with other division leaders and the senior executives of Holmes.  W1 confirmed that Holmes used a software program called SAP to input and track sales data.  The system was a "live system" and was used and accessed by all divisions, the Vice Presidents and Kelliher.  The information was available to anyone accessing the system as soon as it was entered.  SAP was used to document sales, pricing, forecasting, "basically anything that has to do with the financial end of our business."  W1 used the SAP system to input daily sales updates, and forecasts. All executives and Holmes employees had ready access to varying degrees depending on the employee's position, to the company's sales data which was entered and updated on a daily basis by sales managers as part of their job responsibilities on Holmes'

SAP system.  The SAP system would include all sales information as well as projections.  After completion of the acquisition, this system was also accessible to Defendants.

31.     By July 2005, Defendants were participating in weekly meetings with Holmes' executives, where Holmes' sales performance was reviewed in detail against the projections and actual sales.  As reported by W1, by August 2005, sales in each division of Holmes were "off by millions."

32.     W1 reported that Holmes' performance compared to projections was addressed at monthly Results and Forecast Meetings prior to the acquisition, which would include the entire executive staff—all vice presidents, the CEO Jerry Kahn, and CFO Kelliher.  During the meetings, the financial progress of the company including projections, expense, and short falls were addressed.  Following the acquisition, these meetings were changed to a weekly basis and were attended by Andy Hill the CEO of JCS and JCS's CFO Al Lefevre, Holmes' CFO John Kelliher, Paul Powers (Holmes' Vice President and General Manager of Home Environment), Bart Plaumann (Holmes' Vice President and General Manager of Kitchen), Chuck Stravin (Holmes' Vice President of Finance for the Kitchen group) and Bill Van De Venter (Holmes Vice President of Finance for the Home Environment group).

33.     By October 2005, Holmes was feeling the effects of Hurricanes Katrina and Rita. In fact, the impact of these severe storms was the subject of memos issued by Stravin and Van De Venter to JCS at Andy Hill's request, and was a "serious" concern for Hill and JCS. According to a former Holmes Global Communications Manager ("W2") who was employed by Holmes for at least 4 years leading up to the acquisition and throughout the Class Period, Holmes' customer base was hard hit by Hurricanes Katrina and Rita, kitchen appliance and crock-pot sales were down, and advertising and marketing people were "pulling ads to save

money."  As W2 stated, "[e]ven with the holidays coming, we could not afford to pay for all of

the advertising that we had done in the past."

### Materially False and Misleading Statements
### Issued During the Class Period

34.     The Class Period commences on June 29, 2005.  On that date, Jarden issued a

press release entitled "Jarden Corporation Announces Definitive Agreement to Acquire The

Holmes Group, Inc."  In the press release, Jarden reported that it had agreed to buy the Holmes

Group, Inc. for $625 million, consisting of $420 million in cash and 4.1 million shares of Jarden

common stock.  The press release also represented that the acquisition of Holmes would be

"immediately accretive" to earnings stating in pertinent part as follows:

> The transaction is expected to be **immediately** accretive to
> earnings and close during the third quarter, subject to customary
> closing conditions. The Company's waiting period for Hart-Scott-
> Rodino approval has already expired.
>
>         *     *     *
>
> Holmes has annual revenues of approximately $700 million and an
> adjusted non-GAAP EBITDA of approximately $95 million. Based
> on a $625 million enterprise value for the business, the acquisition
> multiple is approximately 6.5 times the adjusted non-GAAP
> EBITDA run rate, **before any synergies.**  [Emphasis added.]

35.     That same day, Defendants held a teleconference with analysts to discuss the

Holmes acquisition.  During the call, Defendant Franklin represented that the Holmes acquisition

would greatly increase Jarden's revenues and improve its gross margins emphasizing Holmes's

historical EBITDA margins, including EBITDA in 2004 of $95 million.  Defendant Franklin

stated in pertinent part as follows:

> The business has impressive cash flows in the second half of the
> year and the management team is strong, experienced and eager for
> the opportunity to take Holmes brands to the next level.
> **Importantly, Holmes has a similar entrepreneurial cultural**

> **culture to that of Jarden, which bodes well for maximizing the synergistic opportunities the transaction will create.**
>
> From a financial as well as operational perspective we believe that the Holmes acquisition is extremely attractive for our existing and new shareholders. The transaction further diversifies our product offerings giving us annualized revenue run-rate of approximately $3.4 billion. **The gross margins are similar to our existing business at 27% but the transaction will help improve the time line we established for following the American Household acquisition of returning Jarden to 15% + EBITDA margins within the next three to five years.** It is not a usual custom to give guidance to the Street. But with June drawing to a closing and given the size of this transaction, I have asked Ian [Ashken] to give you a brief overview of Jarden's Q2 outlook and the impact of the Holmes transaction on earnings for 2005. (Emphases added)

Furthermore, during the call, Defendant Ashken represented that the transaction would offer certain "synergies" stating in pertinent as part as follows:

> The Holmes transaction should offer a number of **synergies**. We have not fully quantified these yet, but are comfortable that we will achieve at least $15 million of cost savings within the next 24 months. **This will further help to expand margins. Holmes's historical adjusted EBITDA margins of 13 to 14% will help Jarden drive towards its overall EBITDA margins.** (Emphasis added.)

Finally, analyst Joe Altobello of CIBC World Market asked, "Okay and then lastly, it seems like the deal has come together pretty quickly. And I know Martin, in the past, you've pursued acquisitions sometimes for years. How familiar are you guys with the operations, outside of the American Household guys?" Defendant Franklin provided the response, and represented that Jarden had done due diligence on the Holmes acquisition stating in pertinent part as follows:

> Well that is a good question. But we – first of all I would say that the American Household guys are very familiar with it, because of all their history. And second we have been aware of it for well over a year. We had not pursued it and quite frankly if we did not own – if we had not bought American Household and owned Sunbeam, we probably would not have pursued it. I mean the

whole logic here was the combination and how it strengthens and enhances our ability to improve margins in what was Sunbeam. **So in terms of the due diligence, again Ian and I and our team, you know, we have been doing this due diligence with the same hands-on approach that we have on the other transactions. I was in China. I walked the facilities. I visited their offices in Hong Kong. I have been up to Boston – kicked the tires, met the management teams. We have done all the things that we would do to get to know a business and felt very comfortable. In fact I would tell you that the more we got to know the business, the better we felt about it. It is a really first-class team of operators inside that business.** (Emphasis added.)

36.     As a result of the Defendants' positive statements, Jarden's stock price rose from $50.22 per share on the previous trading day, to $55.20 per share on June 29, 2005 (pre-spilt adjusted)[2].

37.     The statements referenced above in ¶¶ 34, 35 were each materially false and misleading when made because they misrepresented and failed to disclose the following material adverse facts which were known to Defendants or recklessly disregarded by them:

(a)     that Holmes was experiencing declining demand for its products and was not meeting its internal sales projections as set forth in detail at ¶¶ 28-33;

(b)     as a result of the foregoing, Jarden was not likely to achieve the expected "synergies" from the Holmes Acquisition; and

(c)     that Jarden would not be able to meet its projected results and cash flows due to the adverse factors then impacting Holmes' business, as detailed herein.

38.     On July 18, 2005, Berkshire Partners LLC announced the completed sale of The Holmes Group to Jarden for approximately $420 million in cash and 6.2 million shares of Jarden common stock.

---

[2] On  June 9, Jarden announced that its Board of Directors approved a 3-for-2 stock split of its outstanding shares of common stock. Stockholders of record at the close of business on June 20,

39.     On July 28, 2005, Defendants conducted an earnings conference call with analysts to discuss Jarden's Q2 2005 performance, with sales of $754 million, adjusted EBITDA of $91 million and adjusted earnings per share of $.58.   During the call, Defendant Ashken commented on Jarden's debt to EBITDA ratio, a key metric for measuring the Company's success.

> **One of the key metrics we use that impacts the balance sheet is maintaining our debt to EBITDA ratio of no higher than approximately 3.5 to 1**.   We stated this call back (sic) when Martin and I joined the Company in 2001 and we've adhered to it despite some significant acquisitions over the last several years. This is a qualitative difference between Jarden and certain other acquisition-oriented companies.   Not only are we disciplined in how we buy businesses, especially our 5 to 7 times EBITDA multiples on historical run rates, pre-synergies, but also our relatively conservative leverage helps us maintain a low risk profile, particularly in light of Jarden's historically strong free cash flow.  (Emphasis added.)

Defendant Franklin affirmed Ashken's assurances that Jarden would maintain its EBITDA to debt ratios.  During the call, in response to an analyst's question concerning weak earnings in the consumer sector, and asked whether that weakness is reflected in the Company's trends, Franklin stated:

> Let me tell you, I'm glad you asked that question.   Our third quarter, as we see it at the moment, our retailers, **it is trending exactly as we would like.**   We feel very good about the third quarters.   It should be the biggest quarter of the year for us and I think it's all looking exactly as we had hoped.   We are aware that other companies have missed, but there was one particularly one today.   It has nothing to do with us, and I would like to say, it's all a question of expectations.
>
> **Our expectations, and what we try to guide the Street towards in our – is realistic and well within the bounds of the abilities of our business, and so I'm not sure that things are necessarily bad for other people**.   It's just that maybe the expectations are too high.   So, that's your world, not mine.   But I don't think that

---

2005 received one additional share of Jarden common stock for every two shares of Jarden common stock owned on that date. The additional shares were distributed on July 11, 2005.

there's anything wrong with retail.  I think the consumer is there
and, thankfully, they seem to be buying our product, which is what
the game's all about.  (Emphases added.)

40.    The statements referenced above in ¶39 were materially false and misleading for

the reasons set forth above in ¶ 37 above.

41.    In response to Defendants positive statements concerning the anticipated

EBITDA contribution to be realized from the Holmes Group acquisition, Jarden common stock

price reached $56.76 (pre-spit) on July 7, 2005.  This increase more that satisfied the required

$56 price required to trigger Jarden's right to convert the Series B Preferred Stock to common

stock.  The Series B Preferred Stock paid an in-kind dividend, and was issued by Jarden to fund

the AHI acquisition.  As long as the Preferred Stock existed, Jarden's ability to raise funds for

future acquisitions was severely restricted.  By converting the Preferred Stock to common stock,

these restrictions and burdens would be removed.  The Company's common stock traded at or

above the $56 trading price for (20) consecutive trading days, from July 7th through August 3,

2005.

42.    During this time, Defendants also profited by the Company's rising stock price.

On August 1 and 2, 2005, Defendant Franklin sold 126,000 shares for proceeds of over $4.8

million.  At the same time, Defendant Ashken disposed of 135,000 shares for proceeds of over

$5.1 million.

43.    On August 8, 2005, Jarden announced that it had exercised its right to convert all

outstanding principal and accrued dividends of its Series B Preferred Stock into common stock,

effective August 14, 2005.  Upon conversion, Jarden would no longer be subject to the dilutive

effect of the paid-in-kind dividends associated with the preferred stock.  Following the

conversion, Jarden would have approximately 70 million fully diluted shares outstanding, with

Warburg Pincus LLC and its affiliates owning approximately 21% of the fully diluted shares.

44.     Commenting on the conversion of the Series B Preferred Stock, analyst CIBC World Markets ("CIBC") stated in their August 8, 2005 report, "This is not a surprise, as JAH management has stated its intentions to convert the preferred into common in order to avoid the dilutive effect of the payment-in-kind dividend."  The analyst further remarked, "We remain bullish on JAH and continue to view it as a 2H story, with the key data point to focus on being operating cash flow [EBITDA].  We expect significant cash generation to occur in 3Q and 4Q (due primarily to seasonality), and are comfortable with guidance of greater than $250 million in OCF [operating cash flow] in 2H05."

45.     In a September 28, 2005 report, CIBC provided comment on a recent meeting with senior management at Jarden, which included Defendants Franklin and Ashken.  CIBC reported that the Company "remains on track to meet or exceed its cash flow targets for 2005, including $250 million in cash from operations in the second half of this year, although heavily weighted toward 4Q."

46.     On October 27, 2005, Jarden issued a press release to announce its financial results for the three and nine months ended September 30, 2005.  Therein, defendant Franklin commented:

> Martin E. Franklin, Chairman and Chief Executive Officer, commented, "Our businesses produced another record quarter. Our strong operating performance in the face of tough macro economic conditions shows the resilience of our diversified portfolio of brands and markets has paid off. These positive results were driven by organic growth in our **Consumer Solutions and Outdoor Solutions segments, coupled with continuing synergy programs across all of our business segments**. As always, credit goes to our employees whose continued hard work has enabled us to meet and exceed our stated financial and strategic objectives. **We are confident that our cash flow and other financial goals for 2005**

**should be achieved, which sets a platform for further success in 2006."**(Emphasis added)

47.     On the same day, Defendants conducted an earnings conference call with analysts, wherein Defendant Franklin predicted that Jarden would meet its performance goals for Q4 and fiscal 2005.  According to Franklin, "At this point we see the strong sales performance in Q3 continuing into Q4, and expect to meet or exceed the Street's revenue and cash flow expectations for Q4."  During the call, Defendant Ashken commented on the significant achievement attained in converting the Series C and Series B Preferred stock into common stock.

> During the quarter, we were successful in converting the Series C and Series B preferred stock into common stock.  This was important in two regards.  Firstly, it stopped approximately $10 million in fixed dividends accruing each year; and secondly, it cleaned up our equity sections so that the actual shares were equivalent to the pro forma shares we presented in the last two quarters.

Defendant Ashken also reiterated the Company's guidance on cash flow from operations:

> Based on the cash flow pattern in previous years and the strong start to the seasonally strong cash flow period of September 1st through January 31st, we believe we will comfortably exceed the second-half forecast, with over $200 million of cash flow from operations in Q4.

During the call, analyst Charles Strauzer, from CJS Securities, asked "You talked about the strong (ph) cash flow in Q4 that everyone is expecting.  It sounds like it's trending ahead of expectations.  What is giving you the confidence there?"  In response, Defendant Ashken stated:

> I think two things, Charlie.  **One is, obviously, we have the advantage of the [sic] seeing the pattern of our American Household and Holmes businesses' cash flow in 2004, which the markets don't.  And we are really trending exactly – in fact, a little bit ahead of where we expected to be at this time. And given that this is driven by revenue and collecting receivables during Q4, that's why we feel comfortable with not**

18

> **only the historical patterns but what's actually going on in October.** [Emphasis added.]

In response to a question from analyst Joe Norton from Banc of America Securities concerning the strength of this year's crock-pot sales, Defendant Ashken stated, "It's just going fine."

48.     The statements referenced above in ¶¶ 46-47 were each materially false and misleading when made because they misrepresented and failed to disclose the following material adverse facts which were known to Defendants or recklessly disregarded by them:

(a)     that Holmes was experiencing declining demand for its products and was not meeting its internal sales projections as set forth in detail at ¶¶ 28-33;

(b)     as a result of the foregoing, Jarden was not likely to achieve the expected "synergies" from the Holmes Acquisition; and

(c)     that Jarden would not be able to meet its projected results and cash flows due to the adverse factors then impacting Holmes' business, as detailed herein.

49.     Despite such positive remarks, the market reacted to the news of Jarden's operating cash flow for 3Q negatively, falling 9 percent in value on October 27, 2005 to $42.90 from a (pre-split) the prior days' close of $47.29 (pre-split) on heavy trading.  Commenting on the drop, CIBC stated, "[d]uring the quarter, JAH generated $48 million in operating cash flow, in line with our forecast.  However, we believe this was at the low end of what some investors had anticipated, with some operating cash flow expectations in the range of $50-75 million.  Further, this leaves the company over $200 million short of its 2H target of at least $250 million in operating cash flow.  While we continue to have confidence in JAH's ability to deliver on this target, management didn't help its cause by refusing to give pro forma historical cash flow

figures during its earnings conference call to provide additional comfort, and in this difficult market, 'trust us' just isn't an acceptable answer."

50.     Analyst SunTrust Robinson Humphrey ("SunTrust") commented on the 3Q conference call, indicating that management predicted cash flow from operations would exceed its original guidance of $250 million—with the majority of the cash flow ($200 million +) realized in 4Q.  SunTrust commented it "remained extremely comfortable with JAH's forecasting ability" noting that Jarden uses a rolling 8-week cash flow forecast, using bottoms-up calculations.  "This budgeting method has not only proved to be accurate, but the company has also not missed a quarterly estimate since management arrived in 2001."

51.     In response to the decline in its stock price, Defendants held an Analysts Day meeting on November 2, 2005, which, although earmarked to largely address Jarden's Coleman outdoor product lines, also addressed EBITDA projections for Holmes Group.  During the presentation to analysts, Defendant Ashken commented on the Company's focus on cash flow, and the reasons for their projections for 2H.

> Those of you familiar with the company will know that although we are a public company and EPS [earnings per share] is important, **we run this company for cash flow**.  And the reason we do that is that the fuel that drives the growth business allows us to reinvest in our brands.  **And also to fund acquisitions while keeping our focus at EBITDA within our 3.5 times goals [debt ratios].  We have attractive EBITDA margins**.  Typically the old Jarden was 15 to 20%, and it is one of our stated goals to take them up.  Last year when we spoke about the business grew around 10 to 11.  This year will be 11 to 12, and there will be at least a 1% progression each year to that 15% goal.
>
> *          *          *
>
> So today from an operating basis I wanted to go through and show you some information that will at least explain how we looked at it and why, from our perspective we feel that actually working

capital is an opportunity and we are doing a pretty good job and feel very comfortable with the cash flows that are forecast at Q4.

What this graph shows, and it is cut off at the top, but it is from an operating point of view as you look at the major working capital components, inventory, receivables, accounts payable.  And what you see is that the line graph starts in September of '04, and we have had aggregation of the numbers purely from Holmes, American Household and the legacy business.  What you will see in the topline which is the combined network and capital movement is that it has this S shape.  And what happens is between September and December you generate an awful lot of cash.  You then start to build cash up or your working capital up which again feeds in September and it comes down again in December.  **If we look in a little bit more detail at Q4, 2004 cash flow and what this slide shows is you can take the actual Jarden cash flow from operations, which is $42 million last year in Q4 and you just simply aggregate without backing out any of the adjustments what the cash flow from operations was for Holmes and American Household at Q4 of last year, you come up with a total of about $170 million.**

*          *          *

And what we did on the next slide is if you look at the bottom part to start with, we said we took a hypothetical and we said okay, we take the analyst estimates for net income, G&A and the non-cash taxes – you come up with a subtotal of $89 million of cash flow in Q4, which means that if you were going to invest the 200 million dollars plus of cash flow from operations in Q4, how much of that would come from working capital.  And you can see of the 1.24 billion you would need 11% movement in working capital in Q4. Our own internal forecasts are for us to have just over 12% change in working capital on Q4.  Which is why, of course, we are so comfortable that we will exceed the estimate that was out there for $200 million.  (Emphases added.)

52.     As expected, analysts responded favorably to Defendants' presentation.  SunTrust commented in their November 2, 2005 report, "We attended Jarden's analyst day in New York, coming away increasingly encouraged by the prospects for the company over the next year and comfortable in our above-mean EPS estimate for 2006. . . Management also provided a detailed overview of why it is so comfortable in achieving $200 million in cash from operations in 4Q05.

Based on this presentation and our analysis of the company's public filings, we believe the company's guidance is not only achievable but conservative."  Commenting on the significance of achieving this goal, SunTrust stated, "[w]hy is 4Q05 CFO [cash from operations] so important?  In our opinion, JAH is a cash flow story and if it can achieve its cash flow expectations in 4Q, the story will move to the next chapter.  Jarden's share price rose $1.44 that day to close at $47.43 (pre-split) per share.

53.     On November 4, 2005, Franklin sold 281,000 shares of Jarden common stock for proceeds of over $2.8 million.  On the same day, Defendant Ashken disposed of 31,500 shares for proceeds of over $1.1 million.

### The Truth Begins to Emerge

54.     On January 12, 2006, prior to the opening of the market, Jarden held a conference call to discuss its year end financial results.  On the call, defendant Franklin stated:

> The purpose of the call today is to discuss Jarden's performance in Q4 ahead of our scheduled February 14th earnings release date, as well as to preview the outlook for our business as we enter the New Year.
>
> *                    *                    *
>
> As mentioned earlier, the legacy Sunbeam business had another strong quarter in Q4. **However, our Holmes and FoodSaver businesses did not meet expectations during the quarter. At the time of the Holmes acquisition in July 2005, we projected this business would contribute annualized adjusted EBITDA of approximately $95 million for 2005, with the vast majority of this in the second half of the year. Based on the sales mix and cost run rate in Q4, we now estimate this business will miss these projections by approximately $15 million**.
>
> *                    *                    *
>
> **In hindsight, the original forecasts for Holmes provided to us at the time of the acquisition were overoptimistic. This fact [covered] with the integration of entrepreneurial business such**

> **as Holmes during the busiest season resulted in a significant**
> **burden for the management and infrastructure of the business.**
> **In short, during 2005, the business did not perform up to the**
> **level we expected it to.**  (Emphases added.)

55.     During the call, analyst Joe Altobello from CIBC, asked, "[h]ow much of the

integration problems you saw [at Holmes] were really a lack of due diligence and how much was

sort of lack of execution, if you want to apportion blame so to speak?"  In response, defendant

Franklin stated:

> "I take the blame. . . .   They have a much more -- seat of pants is
> too – is not a charitable enough description, but it's much more
> driven by – had an entrepreneurial leader and had a less formal
> process than we're used to for planning….  And I think that it's just
> – with hindsight, I probably should have built more conservation
> into what we thought it would do rather than just relaying what
> they thought it would do.

Despite Franklin's assumption of "blame"—Defendants Franklin and Ashken each profited

greatly through their insider selling during the Class Period, with Franklin selling 488,911 shares

for proceeds of $16.6 million, and Ashken disposing of 293,752 shares for proceeds of $10.7

million.

56.     As analyst SunTrust commented on the Holmes' shortfall, "[t]he shortfall was

attributed to lower operating profit in the Consumer Solutions division, which includes Holmes

and FoodSaver.  Consumer Solutions represents 50% of JAH"S total revenue base, but closer to

70% of 4Q revenue.  Holmes (20% of total revenue) represented the majority of the shortfall.

The business is now expected to post $80 million in 2005 EBITDA, $15 million below original

expectations."

57.     Later that day, Jarden, in a press release, provided a business update for fiscal

2005 as well as its outlook for fiscal 2006.  Therein, the Company stated:

> During the fourth quarter, in aggregate, the results of our Branded
> Consumables, Outdoor Solutions and Other segments as well as

our legacy Sunbeam business were ahead of last year and exceeded our forecast for the fourth quarter**. However, the two businesses being integrated into our Consumer Solutions segment, FoodSaver and Holmes, did not meet our expectations in the fourth quarter. That said, we view this as primarily a timing and integration issue and remain confident about both businesses, particularly regarding the synergies that we have yet to realize from the Holmes acquisition.**  [Emphases added.]

58.     On news of this, shares of Jarden fell $3.37 per share, or 11.08 percent, to close at $27.05 per share on January 12, 2006.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

59.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Jarden between June 29, 2005 and January 11, 2006 inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Jarden common stock was actively traded on The New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Jarden or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.     Plaintiffs' claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: (1) whether the federal securities laws were violated by Defendants' acts as alleged herein; (2) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Jarden; and (3) to what extent the members of the Class have sustained damages and the proper measure of damages.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

65.     The market for Jarden securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Jarden common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Jarden securities relying upon the integrity of the market price of Jarden securities and market information relating

to Jarden, and have been damaged thereby.

66.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Jarden common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

67.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Jarden's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Jarden and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein when the inflation came out of the price of the common stock.

## **LOSS CAUSATION**

68.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

69.     During the Class Period, Plaintiffs and the Class purchased common stock of

Jarden at artificially inflated prices and were damaged thereby.  The price of Jarden common stock declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, the artificial inflation of its common stock was reduced, first on October 27, 2005 when the price per share fell $3.30 or 9% from the prior day's close of $35.56 to $32.26, and when the price per share fell $3.37, or 11.08 percent, from $30.42 per share to close at $27.05 per share on January 12, 2006, damaging investors.

70.     The timing and magnitude of Jarden's stock price decline negates any inference that the loss suffered by Plaintiffs and other class members was caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to the Defendants' fraudulent conduct.

## ADDITIONAL SCIENTER ALLEGATIONS

71.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Jarden, their control over, and/or receipt and/or modification of Jarden allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Jarden, participated in the fraudulent scheme alleged herein.

72.     Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

73.     Defendants were motivated to commit the fraud described herein because their compensation was tied directly to the price of Jarden stock.

74.     As the Company reported in its Form Pre 14A (a preliminary proxy statement) filed on April 6, 2005, the Board of Directors in its deliberations in connection with the AHI transaction which closed on January 24, 2005, recognized that the current vesting targets for the restricted stock grants were no longer the most effective criteria for incentivizing management to enter into the transaction to acquire AHI, to close the equity infusion by Warburg Pincus and Catterton or to refinance the Company's credit facility in connection with the AHI acquisition. Upon recommendation from the Compensation Committee, the Board accelerated the grant of 525,000 shares of restricted stock subject to grant under defendant Franklin's employment agreement, of which 150,000 shares would have been granted on January 1, 2005, 187,000 shares would have been granted on January 1, 2006 and 187, 500 shares would have been granted on January 1, 2007, in accordance with the terms of the employment agreement, as well as accelerating the vesting of 100,000 shares of restricted stock issued on August 5, 2004.  At the same time, the Board also changed the performance criteria from a future targeted increases in the share price to the Company in connection with the agreement with AHI.

75.     On January 24, 2005, in connection with the closing of the AHI acquisition, Defendant Franklin entered into an amended employment agreement with the Company,

effective upon shareholder approval, where his salary was increased from $850,000 to

$1,840,000.  Based upon the amended employment agreement, Franklin was also entitled to an

operating bonus of up to 50% of his base compensation each year for achieving the Company's

earnings per share budget and up to 100% of base compensation for achieving 110% of the

Company's earnings per share budget based on the annual budget approved by the Board.

Franklin was also entitled to a discretionary performance-based bonus up to 100% of base

compensation at the discretion of the Board, and subject to the approval of the Board member

designated by Warburg Pincus concerning calendar years 2005 and 2006.  The amended

employment agreement also provided for a grant of up to 915,000 shares, half of which would

vest on November 1, 2005 if, prior to that time, Jarden's stock had risen to $56 per share for (10)

consecutive trading days, and the other half would vest if the stock rose to $64 per share for a

period of (10) consecutive trading days.

      76.     Defendant Ashken was also incentivized by the Board to boost Jarden's share

price during the Class Period.  On the closing of the AHI transaction, Ashken's employment

agreement was amended, providing for 380,000 shares of restricted stock, with modified vesting

restrictions.  Ashken also received an increase from his 2004 base annual salary of $450,000 to

$850,000.

      77.     Under the newly amended employment agreements, and the proposed Amended

and Restated 2003 Stock Incentive Plan which would become effective upon shareholder

approval at Jarden's annual shareholder meeting, Franklin's and Ashken's vesting restrictions on

stock grants would lapse as follows:  (i) 50% on the date that the stock price of the Company's

common stock equals or exceeds $50 for 10 consecutive trading days prior to the third

anniversary of the restricted stock grant, (ii) 100% on the date that the stock price of the common

stock of the Company equals or exceeds $64 for 10 consecutive trading days prior to the fifth anniversary of the restricted stock grant, or (iii) the date there is a Change of Control of the Company and either (a) either the Company's stock price is higher than $32 per share at the time of the Change of Control or (b) the Board of Directors approves, in its sole discretion, such vesting.

78.     The restricted stock agreement was approved by the Board on February 16, 2005, and became effective days just before the start of the Class Period on June 9, 2005, following its approval by stockholders at the Company's shareholder meeting.

79.     Under the terms of his new employment agreement and restricted stock agreement, defendant Franklin was also bestowed extraordinary benefits, which would vest if Jarden's stock rose above the target price which, not coincidentally would force the conversion of the Series B Preferred Stock. On the effective date of the new employment agreement, Jarden's closing stock price was at $51.34 per share, making the first batch of 457,500 shares worth $23.5 million.  If these shares vested when the stock price hit $56 per share (and remained there for a number of days), defendant Franklin stood to walk away with stock worth approximately $25.6 million, which represented almost 14 times his base salary.  Given the structure of these agreements, defendant Franklin had a strong incentive to boost Jarden's stock price during the Class Period.

80.     Likewise, Defendant Ashken stood to substantially increase his own personal wealth under the stock granting incentives provided by the Company which were, also keyed to reaching stock price performance that would be sufficient to trigger the mandatory conversion of the Preferred Stock, as Ashken received an additional 380,000 shares of restricted stock in the Company upon the closing of the AHI acquisition.  The restrictions on the stock award were to

lapse in the same manner as the restricted stock granted to Franklin.  Like Franklin, if the first

batch of these shares vested when the stock price hit $56 per share (and remained there for a

number of days), defendant Ashken stood to walk away with $10.6 million, more than 10 times

his base salary.

**Jarden Corp.**
**Insider Sales:  6/29/05 – 1/11/06**

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Ashken, Ian | 08/01/05 | 14,087 | $38.50 | $  542,350 |
| | 08/02/05 | 120,913 | $38.05 | $4,600,740 |
| | 11/04/05 | 31,500 | $35.19 | $1,108,485 |
| | | **166,500** | | **$6,251,574** |
| Azria, Rene Pierre | 08/19/05 | 16,000 | $37.75 | $604,000 |
| | | **16,000** | | **$604,000** |
| Franklin, Martin | 08/01/05 | 13,148 | $38.50 | $  506,198 |
| | 08/02/05 | 112,852 | $38.05 | $4,294,019 |
| | 11/04/05 | 81,000 | $35.19 | $2,850,390 |
| | | **207,000** | | **$7,650,607** |
| Huemme, Douglas | 08/30/05 | 12,000 | $38.21 | $458,520 |
| | | **12,000** | | **$458,520** |
| Lillie, James | 08/01/05 | 1,565 | $38.50 | $ 60,253 |
| | 08/02/05 | 13,435 | $38.05 | $511,202 |
| | 11/04/05 | 7,500 | $35.19 | $263,925 |
| | | **22,500** | | **$835,379** |
| Tolbert, John | 08/01/05 | 21,764 | $38.09 | $828,991 |
| | | **21,764** | | **$828,991** |
| Wood, Robert | 08/19/05 | 8,000 | $38.00 | $304,000 |
| | 08/22/05 | 12,000 | $37.27 | $447,240 |
| | | **20,000** | | **$751,240** |
| | **Total** | **465,764** | | **$17,380,311** |

**Applicability of Presumption of Reliance:**
**Fraud-On-The-Market Doctrine**

81.     At all relevant times, the market for Jarden common stock was an efficient market

for the following reasons, among others:

>       a.      Jarden common stock met the requirements for listing, and was listed and
>       actively traded on the NYSE, a highly efficient and automated market;
>
>       b.      As a regulated issuer, Jarden filed periodic public reports with the SEC
>       and the NYSE;
>
>       c.      Jarden regularly communicated with public investors via established
>       market communication mechanisms, including through regular disseminations of
>       press releases on the national circuits of major newswire services and through
>       other wide-ranging public disclosures, such as communications with the financial
>       press and other similar reporting services; and
>
>       d.      Jarden was followed by several securities analysts employed by major
>       brokerage firms who wrote reports which were distributed to the sales force and
>       certain customers of their respective brokerage firms.  Each of these reports was
>       publicly available and entered the public marketplace.

82.     As a result of the foregoing, the market for Jarden common stock promptly

digested current information regarding Jarden from all publicly-available sources and reflected

such information in Jarden's stock price.  Under these circumstances, all purchasers of Jarden

common stock during the Class Period suffered similar injury through their purchase of Jarden

common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

83.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made.  To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of Jarden who knew that those statements were false

when made.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder Against All Defendants**

84.     Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

85.     During the Class Period, Defendants carried out a plan, scheme and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs

and other members of the Class to purchase Jarden common stock at artificially inflated prices.

In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of

them, took the actions set forth herein.

86.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort

to maintain an artificially high market price for Jarden common stock in violation of Section

10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary

participants in the wrongful and illegal conduct charged herein or as controlling persons as

alleged below.

87.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Jarden as specified herein.

88.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Jarden's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Jarden and its business operations and future prospects in the light of the circumstances under which they were made, not mislead-ing, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Jarden common stock during the Class Period.

89.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's man-agement team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the

Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

90.     The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Jarden's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

91.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Jarden common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Jarden's publicly-traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the

Class acquired Jarden common stock during the Class Period at artificially high prices and were damaged thereby when the price dropped at the end of the Class Period as the true facts and circumstances about the Company were revealed.

92.     At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Jarden was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Jarden common stock or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

93.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

94.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective transactions in Jarden's common stock during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act against Jarden and the Individual Defendants

95.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

96.     This count is asserted against Jarden and the Individual Defendants, and each of them.

97.     The Individual Defendants, and each of them, acted as controlling persons of Jarden and JCS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By

virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.    By virtue of Jarden's ownership of subsidiary JCS and participation in and/or awareness of JCS' operations, Jarden had the power to influence and control, directly or indirectly, the decision-making of JCS, including the content and dissemination of JCS' inflated projections and other information as such information was disseminated by Jarden and incorporated in Jarden's public statements.  Jarden had the ability to prevent the issuance of the false statements concerning JCS' business and financial performance which included the Holmes Group or cause the statements to be corrected.

99.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and JCS, and therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Securities violations as alleged herein, and exercised the same.

100.    As set forth above, Jarden and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

101.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.     Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

b.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  August 25, 2006                    LERACH COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                           SAMUEL H. RUDMAN (SR-7957)
                                           DAVID A. ROSENFELD (DR-7564)


                                           SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

SCHIFFRIN & BARROWAY, LLP
KATHARINE M. RYAN
KAREN E. REILLY
280 King of Prussia Road
Radnor, PA  19087
Telephone:  610/667-7706
610/667-7056 (fax)

Co-Lead Counsel for Plaintiffs

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)

SCHRECK BRIGNONE
ANDREW S. BRIGNONE
300 S. Fourth Street, Suite 1100
Las Vegas, NV  89101
Telephone:  702/382-2101
702/474-4258 (fax)

Additional Counsel for Plaintiffs