UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

ERNESTO DARQUEA,                                      :

                Plaintiff,                 :

                         :     Civil Action No. 7:06-cv-00722-
           v.                            CLB (Consolidated)

JARDEN CORP., et al.,                                :

              Defendants.                :

------------------------------------------------------------ x

## MEMORANDUM IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS</u>

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY  10019-6099
(212) 728-8000

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

THE COMPLAINT ..............................................................................................3

ARGUMENT .....................................................................................................10

I.  THE SECTION 10(b) AND RULE 10b-5 CLAIM MUST BE DISMISSED..................11

    A.  The Complaint Must But Fails To Allege A Material Misrepresentation Or
        Omission. ...............................................................................................11

        1.  The Applicable Pleading Standards. .................................................11

        2.  The Complaint Does Not Adequately Allege Any Material
            Misrepresentation Or Omission. ......................................................12

            a.  Allegations that the Company omitted to disclose that
                Holmes had not met internal sales projections are
                insufficient. ..........................................................................12

            b.  The forward-looking statements concerning expected
                synergies are not actionable. ...............................................15

            c.  The Company did not misstate Jarden's expected cash
                flow. ......................................................................................18

            d.  The allegations referring to Holmes' expected 2005
                EBITDA are not actionable. ................................................19

        3.  The Claim Against JCS Must Be Dismissed Because There Is No
            Allegation That JCS Made Any Representation. ..............................19

    B.  The Complaint Fails To Allege That Any Defendant Acted With Scienter. .........21

        1.  Applicable Standards For Scienter Under The PSLRA. .............................21

        2.  The Complaint Does Not Allege Particularized Facts Creating a
            Strong Inference that Defendants Had Actual Knowledge or Were
            Reckless. .......................................................................................22

            a.  The Complaint's boilerplate allegations of knowledge or
                recklessness are not sufficient............................................22

            b.  The Complaint does not contain particularized facts
                showing that Defendants were reckless or had actual

3404165_33

knowledge with respect to the alleged omissions concerning Holmes' failure to meet internal sales projections...................................................................23

c.    The Complaint does not allege particularized facts creating a strong inference that Defendants had actual knowledge that the expected synergies were not achievable. ..........................24

d.    The Complaint does not and cannot possibly allege actual knowledge that the cash flows would not be met. .........................25

3.    The Complaint Fails To Adequately Allege That Defendants Had Motive And Opportunity To Commit Fraud...............................................25

a.    The alleged restricted stock grants do not create a strong inference of motive. ........................................................................26

b.    The Individual Defendants' compensation and bonus arrangements do not create a strong inference of motive. .............27

c.    The Individual Defendants' stock sales do not create a strong inference of motive. .............................................................28

C.    The Complaint Does Not Adequately Allege Loss Causation...............................31

II.    PLAINTIFFS' CLAIM UNDER SECTION 20(a) OF THE EXCHANGE ACT MUST BE DISMISSED. ..........................................................................................32

CONCLUSION....................................................................................................................34

# TABLE OF AUTHORITIES

## CASES

In re AFC Enters., Inc. Sec. Litig., 348 F. Supp. 2d 1363 (N.D. Ga. 2004)......................21

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995)..........................................11, 27, 28, 30

In re Aegon N.V. Sec. Litig., No. 03 Civ 0603,  2004 WL 1415973
    (S.D.N.Y. June 23, 2004)...........................................................................10, 17, 22, 24

In re Alpharma, Inc. Sec. Litig., 372 F.3d 137 (3d Cir. 2004) ..........................................29

In re Baesa Sec. Litig., 969 F. Supp. 238 (S.D.N.Y. 1997)................................................23

Basic Inc. v. Levinson, 485 U.S. 224 (1988)......................................................................12

Boguslavsky v. Kaplan, 159 F.3d 715 (2d Cir. 1998) ........................................................33

Bond Opportunity Fund v. Unilab Corp., No. 99 Civ 11074 (JSM), 2003 WL
    21058251 (S.D.N.Y. May 9, 2003), aff'd, 87 Fed. App'x 772 (2004) .........................16

In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36 (2d Cir. 2000) ....................................22

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S.
    164 (1994).....................................................................................................................20

Chiarella v. United States, 445 U.S. 222 (1980)................................................................13

Chill v. Gen. Elec. Co., 101 F.3d 263 (2d Cir. 1996) .................................................21, 24, 29

In re Comshare Inc. Sec. Litig., 183 F.3d 542 (6th Cir. 1999) ..........................................24

In re Criimi Mae, Inc. Sec. Litig., 94 F. Supp. 2d 652 (D. Md. 2000) .............................23

In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478, 2003 WL 22801416
    (S.D.N.Y. Nov. 25, 2003) .............................................................................................14

Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005) ..........................................................31

In re eSpeed, Inc. Sec. Litig., No. 05 Civ 2091, 2006 WL 880045
    (S.D.N.Y. Apr. 3, 2006)...........................................................................................17, 29

Elliott Assocs., L.P. v. Convance, Inc., No. 00 Civ. 4115, 2000 WL 1752848 ...............33

Feasby v. Industri-Matematik Int'l Corp., No. 99 Civ. 8761 (HB),
    2000 WL 977673 (S.D.N.Y. July 17, 2000) .................................................................16

Field v. Trump, 850 F.2d 938 (2d Cir. 1988) ...................................................................14

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994)...............10, 16

GSC Partners CDO Fund II, Ltd. v. Washington, 368 F.3d 228 (3d Cir. 2004) ...............17

In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432 (S.D.N.Y. 2005).................17, 22,
    25

Halperin v. eBankerUSA.com, Inc., 295 F.3d 352 (2d Cir. 2002) .............................12, 15,
    17

In re Ivan F. Boesky Sec. Litig., 825 F. Supp. 623 (S.D.N.Y. 1993) .................................13

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ..........................................................11, 21,
    26

In re Keyspan Corp. Sec., 383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..............................28, 29,
    30, 31

Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (S.D.N.Y. 2005) .......................31

Levine v. NL Indus., Inc., 717 F. Supp. 252 (S.D.N.Y. 1989),
    aff'd, 926 F.2d 199 (2d Cir. 1991) ..............................................................................13

Lindblom v. Mobile Telecomms. Techs. Corp., 985 F. Supp. 161 (D.D.C. 1997) ...........21

In re MSC Indus. Direct Co., Inc., 283 F. Supp. 2d 838 (E.D.N.Y. 2003).................29, 30

Mason v. Am. Tobacco Co., 346 F.3d 36 (2d Cir. 2003) ...................................................10

In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243
    (S.D.N.Y. 2003)............................................................................................................21

In re Midway Games, Inc. Sec. Litig., 332 F. Supp. 2d 1152 (N.D. Ill. 2004).................18

In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446 (S.D.N.Y. 2000) .........................13

Nelson v. Stahl, 173 F. Supp. 2d 153 (S.D.N.Y. 2001) .....................................................24

In re Nokia Oyj (Nokia Corp.) Sec. Litig., 432 F. Supp. 2d 364 (S.D.N.Y. 2006) ...........23

Ottmann v. Hanger Orthopedic Group, Inc., 353 F.3d 338 (4th Cir. 2003) ...............25, 27

Papasan v. Allain, 478 U.S. 265 (1986)............................................................................10

Phillips v. LCI Int'l, Inc., 190 F.3d 609 (4th Cir. 1999) ...................................................27

Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225 (S.D.N.Y. 2000) ..................10

Rapoport v. Asia Elecs. Holding Co., 88 F. Supp. 2d 179 (S.D.N.Y. 2000)....................11

Ravens v. Republic N.Y. Corp., No. CIV A. 99-4981, 2002 WL 1969651
    (E.D. Pa. Apr. 24, 2002) ...........................................................................................20

Ressler v. Liz Claiborne, Inc., 75 F. Supp. 2d 43 (E.D.N.Y. 1999) .....................28, 29, 30

Roeder v. Alpha Indus., Inc., 814 F.2d 22 (1st Cir. 1987)................................................13

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)....................................................12, 17,
                                                                                              27

San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.,
    Inc., 75 F.3d 801 (2d Cir. 1996) ........................................................................14, 17

Santa Fe Indus., Inc. v. Green, 430 U.S. 462 (1977) .......................................................14

In re Scholastic Corp. Sec. Litig., 252 F.3d 63 (2d Cir. 2001) .........................................20

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) ......................................21

In re Sina, No. 05 Civ 2154 (NRB), 2006 WL 2742048
    (S.D.N.Y. Sept. 26, 2006)..........................................................................................30

Smith v. Circuit City Stores, Inc., 286 F. Supp. 2d 707 (E.D. Va. 2003).........................23

Taylor v. First Union Corp. of S.C., 857 F.2d 240 (4th Cir. 1988) ..................................13

In re Vantive Corp. Sec. Litig., 283 F.3d 1079 (9th Cir. 2001).........................................29

Wright v. Ernst & Young LLP, 152 F.3d 169 (2d Cir. 1998)............................................20

## STATUTES

15 U.S.C. § 78u-4(b)(1) ..............................................................................................11, 21,
                                                                                              32

15 U.S.C. § 78u-5(c)(1) .............................................................................................17, 25

Fed. R. Civ. P. 9(b) ...............................................................................................12

17 C.F.R. § 240.10b-5 ............................................................................................11

15 U.S.C. § 78j(b)) ................................................................................................11

15 U.S.C. § 78t(a) .................................................................................................33

## INTRODUCTION

On January 12, 2006, following its 2005 earnings release, the shares of Jarden Corporation ("Jarden" or the "Company") fell approximately 11%.  That release disclosed that two of the Company's businesses, FoodSaver and Holmes, did not meet the Company's fourth quarter expectations.  In a conference call with analysts, the Company noted that Holmes, a business acquired in July 2005, had missed its previously undisclosed internal EBITDA (income before interest, taxes, depreciation and amortization) target by approximately $15 million.  The first of these consolidated class action lawsuits was brought within weeks; it made a number of assertions which are demonstrably untrue, including an assertion that the Company had deliberately misled investors regarding Holmes' expected 2005 EBITDA.

Lead Plaintiffs make little more than a passing reference in their Consolidated Amended Complaint (the "Complaint")[1] to any alleged misstatements about Holmes' projected EBITDA.  This is hardly surprising.  Given that Plaintiffs do not allege that EBITDA projections for Holmes were ever publicly disseminated, such projections could not have been misrepresented.  Lead Plaintiffs now claim that the Company's disclosures were misleading in three principal respects.  None of these involve the accuracy of the Company's financial statements, which the Complaint does not challenge.

First, the Complaint alleges that in announcing the Holmes transaction, Jarden did not disclose that Holmes had not met its own internal sales projections prior to the acquisition.  But the Complaint does not allege any facts demonstrating that there was a duty to disclose this information or that this information was material.  The two other alleged misleading statements are both forward-looking.  The Complaint conclusorily asserts that the Company misrepresented

---

[1]     A copy of the Complaint is annexed as Exhibit A to the Affidavit of Eilish M. Cahalan, Esq., sworn to on October 20, 2006 ("Cahalan Aff.").

3404165_33

that the Holmes transaction offered a number of synergies or opportunities to cut costs that were expected to be realized within 24 months and that Jarden expected cash flow in the second half of 2005 of $250 million.  Yet the Complaint does not allege, because it cannot, any factual basis for claiming that the referenced synergies will not be realized within two years; nor does it allege that the Company failed to achieve the $250 million of cash flow that it predicted.  And, as to Sunbeam Products, Inc., d/b/a Jarden Consumer Solutions ("JCS"), a subsidiary of the Company that is also named as a Defendant, the Complaint does not allege that it made any representation, true or false, to Jarden shareholders.  In short, Plaintiffs have not satisfied the most fundamental pleading requirement of their Rule 10b-5 claim -- that they allege a material misrepresentation or omission.

Nor does the Complaint allege any facts giving rise to a strong inference of scienter.  With respect to the alleged failure to disclose that Holmes had not met internal sales targets prior to the acquisition, the Complaint does not allege either facts showing motive and opportunity or strong circumstantial evidence of conscious misbehavior or recklessness.  The pleading burden with respect to the forward-looking statements on which the Complaint is largely predicated is even heavier.  As to these statements, Plaintiffs must allege actual knowledge that they were false.  They have not come close to doing so or provided any facts to support this position.

Finally, the Rule 10b-5 claim must be dismissed because the Complaint does not allege loss causation.  There is no allegation that the Company's 2005 earnings release, which is alleged to have caused the Company's stock decline, made any mention of the matters that Plaintiffs assert were misleading.  Therefore, none of the alleged misrepresentations could have caused Plaintiffs' losses.

The insufficiency of the underlying Rule 10b-5 claim means that Plaintiffs' control person claim under Section 20(a) of the Exchange Act must be dismissed as well. This claim is also deficient because it does not allege culpable participation by the so-called controlling Defendants.

## **THE COMPLAINT**

### The Parties

Jarden is a leading, global provider of a diverse array of consumer products typically used in and around the house, including home canning jars (under brands such as Ball® and Kerr®), rope and cordage (Lehigh®), kitchen appliances and accessories (FoodSaver®, Villa Ware®, Sunbeam®, Oster®, Mr. Coffee®, HeathoMeter®, First Alert®), household consumables such as matches, toothpicks, plastic cutlery, and playing cards (Diamond®, Forster®, Bee®, Bicycle®, Hoyle®), and camping/outdoor products (Coleman®, Campingaz®). (Compl. ¶ 2.) Jarden's shares are listed on the New York Stock Exchange. (Compl. ¶ 20.)

On January 24, 2005, Jarden acquired the former Sunbeam Corporation, emerged from bankruptcy as American Household Incorporation ("AHI"). (Compl. ¶ 5.) On June 29, 2005, the Company announced an agreement to acquire The Holmes Group, Inc. ("Holmes"), a privately-held company. (Compl. ¶¶ 8, 9, 34.) The Holmes transaction closed on July 18, 2005. (Compl. ¶ 38.) The product brands of Holmes include Crock-Pot® slow-cookers, Rival® roasters, and Bionaire® air purifiers. (Compl. ¶ 8.) The Complaint alleges that Defendant JCS owns and operates the acquired businesses of AHI and Holmes. (Compl. ¶ 21.)

Defendant Martin E. Franklin ("Franklin") is the Company's Chairman and CEO (Compl. ¶ 22), and Defendant Ian G.H. Ashken ("Ashken") (collectively with Franklin, the "Individual Defendants") is its Vice-Chairman, CFO and Secretary. (Compl. ¶ 23.)

<u>The Alleged Misrepresentations</u>

This action is purportedly brought on behalf of those who purchased the securities of Jarden between June 29, 2005, the date of the announcement of the Holmes acquisition, and January 11, 2006, the day prior to the Company's issuance of its 2005 earnings release (the "Class Period").  (Compl. ¶¶ 1, 59.)  The Complaint alleges that the Company violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by misrepresenting or omitting several material facts.  (Compl. ¶ 1.)  The Complaint <u>does not allege</u> that the Company misrepresented its financial results or the financial results of Holmes in any respect.

<u>First</u>, the Complaint alleges that in its June 29, 2005 press release and conference call announcing the Holmes acquisition, the Company failed to disclose that Holmes had not been "meeting its internal sales projections."  (Compl. ¶ 37.)  This allegation is based on information purportedly provided by a single confidential informant to the effect that in the first half of 2005 Holmes missed its projections "by about $20 million."  (Compl. ¶ 29.)  It is not alleged that this information was reported to anyone outside of Holmes, including Jarden, Franklin or Ashken.  The Complaint alleges, moreover, that Holmes re-evaluated its sales projections in advance of the April/May, 2005 pre-acquisition due diligence conducted by the Company.  (Compl. ¶ 29.)  It is not alleged that Holmes failed to meet the revised projections.

The Complaint refers to two other alleged facts concerning Holmes' sales, but both of these are post-acquisition.  It is claimed that by August 2005 sales in each division of Holmes were "off by millions" (Compl. ¶ 31) and by October 2005 Holmes "was feeling the effects of hurricanes Katrina and Rita" and kitchen appliance and slow cooker sales were down. (Compl. ¶ 33).  After the July 18, 2005 closing of the Holmes' transaction, Holmes'

3404165_33

post-acquisition revenues were included in the Company's consolidated financials, including the third quarter 2005 financials released on October 27, 2005.  As noted above, the Complaint does not allege that these financials were inaccurate.

Second, the Complaint alleges that in announcing the Holmes acquisition the Company made forward-looking statements that synergies or cost cuts would derive from the acquisition and that there was no reasonable basis for these statements.  (Compl. ¶ 28.)  The only statement of any substance made by the Company concerning synergies that is alleged in the Complaint is the June 29, 2005 statement that "[t]he Holmes transaction should offer a number of synergies.  We have not fully quantified these yet, but are comfortable that we will achieve at least $15 million of cost savings within the next 24 months."  (Compl. ¶ 35.)  According to the Complaint, the Company was not likely to achieve the expected synergies from the acquisition because Holmes was not meeting its internal sales projections.  (Compl. ¶¶ 37, 48.)  The Complaint does not explain, however, why declining demand for Holmes' products prior to the acquisition would affect the Company's ability to achieve savings, particularly over a two year period after the acquisition.  Further, it is clear from the statement itself that the end of the 24 month period referred to is still almost a year away.  Indeed, in the Company's January 12, 2006 announcement that marks the close of the Class Period, Jarden specifically stated that it remained confident "regarding the synergies that [Jarden has] yet to realize from the Holmes acquisition." Cahalan Aff., Ex.B, (Form 8-K of Jarden Corporation and Exhibit 99.1 thereto, filed Jan. 17, 2006 ("January Press Release"), at 2.

Third, Plaintiffs allege that the Company misrepresented its own projected financial results.  According to the Complaint, Jarden "would not be able to meet its projected results and cash flows due to the adverse factors then impacting Holmes' business."  (Compl.

¶¶ 37, 48.)  However, the only specific financial projections for Jarden mentioned in the Complaint concern its second half 2005 cash flow.  As to that, it is alleged that in the release of its third quarter results on October 27, 2005, the Company stated that it was confident that it would achieve cash flow of $250 million for the final two quarters of the year, with over $200 million of cash flow from operations in Q4.  (Compl. ¶¶ 46, 47.)  While Plaintiffs baldly assert that this forward-looking statement was inaccurate or misleading, the Complaint itself reveals exactly the opposite.  It specifically concedes that Jarden generated $48 million in operating cash flow in 3Q.  (Compl. ¶ 49.)  And the Company's January 12, 2006 press release quoted in the Complaint explicitly states that over $200 million of cash flow was realized in 4Q.  See Cahalan Aff., Ex. B (January Press Release), at 1; see also Cahalan Aff., Ex. C (Transcript, titled Jarden Corporation Provides Update on Fourth Quarter Business Results-Final, dated Jan. 12, 2006 ("January Analyst Call Transcript"), at 2.

Finally, in the Complaint's introduction it conclusorily alleges that Defendants misled the market "as to the projected contribution to EBITDA by the newly acquired Holmes Group."  (Compl. ¶ 12.)  However, this allegation is not repeated later in the Complaint, under the heading "Materially False and Misleading Statements Issued During the Class Period," in which Plaintiffs purport to catalogue the misleading statements on which this action is based.  Moreover, the Complaint does not cite a single instance in which the Company publicly disseminated EBITDA projections for Holmes.  What the Company did disclose, as the Complaint makes clear, was Holmes' historical EBITDA of $95 million.  (See Compl. ¶ 35.)  But there is no allegation that that disclosure was inaccurate.[2]

---

[2]  The Complaint appears to confuse cash flow and EBITDA.  For example, in paragraph 44, in quoting an analyst, the Complaint adds the acronym "EBITDA" in brackets after the words "operating cash flow", suggesting that they mean the same thing.  (Compl. ¶ 44.)  Cash flow and EBITDA are two completely different financial concepts.  "Cash flow" is a recognized GAAP accounting term and measures cash

The Scienter Allegations

      Aside from several conclusory allegations that Defendants received "information reflecting the true facts regarding Jarden", were "privy to confidential proprietary information concerning Jarden" and "participated in the fraudulent scheme" (Compl. ¶ 71), Plaintiffs attempt to show scienter by alleging that Franklin and Ashken had motive and opportunity to commit fraud.  Franklin and Ashken's incentive to do so, according to the Complaint, stems from the fact that their compensation was allegedly "tied directly to the price of Jarden stock."  (Compl. ¶ 73.) In making this allegation, Plaintiffs ignore that one of Franklin and Ashken's basic responsibilities as senior executives was to increase the price of the Company's stock, a fact that numerous courts have recognized in rejecting similar scienter claims.

      In this regard, the Complaint alleges that in 2004 Franklin was granted a right to receive 525,000 shares of restricted stock with the restrictions to lapse on January 1, 2005, 2006 and 2007 and an additional 100,000 shares of restricted stock, granted August 5, 2004, with the restrictions to lapse when the Company's shares reached a specified share price.  (Compl. ¶ 74.) According to the Complaint, prior to the AHI acquisition, which closed in January, 2005, the restrictions on these shares were modified by the Compensation Committee so that they would lapse and the shares would vest upon the completion of the AHI merger.  (Compl. ¶ 74.)  The Complaint does not explain how shares that vested upon the AHI merger, which closed on January 24, 2005, could have created a motive to commit fraud during the Class Period, which did not begin until six months later.

      The Complaint also alleges that additional shares of restricted stock granted to Franklin (915,000) (Compl. ¶ 75) and to Ashken (380,000) (Compl. ¶ 76) on January 24, 2005 in

---

actually received and expended during a particular period.  EBITDA is not a GAAP accounting term.  It starts with accrual based Net Income and then adds back interest, taxes, depreciation and amortization.

3404165_33

their employment agreements also provided a motive to commit fraud.  According to the Complaint, the restrictions on 50% of these shares were to lapse when the Company's share price reached $50 per share for 10 consecutive trading days.  (Compl. ¶ 77.)[3]  But as the Complaint also makes clear, the stock price reached $51.34 prior to the announcement of the Holmes acquisition.  (Compl. ¶ 79.)  So there was no need for Franklin and Ashken to boost the stock price in order to receive the benefit of these restricted shares.  Moreover, in June 2005, Franklin and Ashken agreed to an increase in the price at which the restrictions on these shares would lapse to $56, and it is the Individual Defendants' desire to achieve this increased vesting price that the Complaint alleges improperly motivated them.  See Cahalan Aff. Ex. D (Amended Restricted Stock Agreement at Exhibits 10.8 and 10.9 of Form 10-Q of Jarden Corporation, filed August 9, 2005, demonstrating that the vesting price was changed as of June 23, 2005 to $56.); (Compl. ¶ 75.).

The Complaint further alleges that Franklin and Ashken's January 24, 2005 employment agreements increased their salary and bonus compensation from the amounts received in the prior year, and made the bonus compensation dependent upon meeting certain annual budget targets.  (Compl. ¶¶ 75, 76.)  None of these payments are alleged to have been contingent on an increase in the Company's share price.  In fact, the bonuses could only be adversely affected if Holmes performed poorly, as Plaintiffs claim Franklin and Ashken knew it would do.

---

[3]    It is alleged that the restrictions on the other 50% are to lapse when the stock price reaches $64 per share for 10 consecutive trading days.  (Compl. ¶ 77.)  It is not alleged that the stock price reached this level or that these shares have vested.

3404165_33

Finally, the Complaint alleges that Franklin and Ashken sold shares during the Class Period and that this evidences motive. (Compl. ¶¶ 11, 42, 53, 80.) But the Complaint does not allege any facts showing that these sales were unusual or suspicious.[4]

The Alleged Corrective Disclosure

The Complaint conclusorily alleges that the price of Jarden's stock declined when misrepresentations and/or information concealed from the market were revealed first on October 27, 2005, when the price per share fell $3.30 or 9% from the $35.56 to $32.26. (Compl. ¶ 69.) The Complaint, however, does not refer to any specific corrective disclosure that was made on that date. Instead, it alleges that the Company made "positive remarks" concerning its expected cash flow for the fourth quarter of 2005, but that analysts had expected that cash flow would be at an even higher range. (Compl. ¶ 49.) In addition to the conclusory allegation that partial corrective disclosure was made on October 27, 2005, the Complaint alleges under a section headed "The Truth Beings to Emerge" that the true facts were disclosed in an analyst call on January 12, 2006. During this call, Defendant Franklin is alleged to have explained:

> As mentioned earlier, the legacy Sunbeam business had another strong quarter in Q4. **However, our Holmes and FoodSaver businesses did not meet expectations during the quarter. At the time of the Holmes acquisition in July 2005, we projected this business would contribute annualized adjusted EBITDA of approximately $95 million for 2005, with the vast majority of this in the second half of the year. Based on the sales mix and cost run rate in Q4, we now estimate this business will miss these projections by approximately $15 million.**
>
>         \*       \*       \*
>
> **In hindsight, the original forecasts for Holmes provided to us at the time of the acquisition were overoptimistic. This fact [covered] with the integration of entrepreneurial business such**

---

[4]     All the share sales by Franklin and Ashken since 2002 have been pursuant to independently controlled 10b5-1 programs. See *infra* at footnote 14.

> **as Holmes during the busiest season resulted in a significant
> burden for the management and infrastructure of the business.
> In short, during 2005, the business did not perform up to the
> level we expected it to.**

(Compl. ¶ 54 (emphasis and alterations in original).)  Following this call, the Company's shares

are alleged to have fallen $3.37 to close at $27.05.  (Compl. ¶ 58.)  This January 12, 2006 release

did not address any of the matters alleged to have been misrepresented or omitted.

## **ARGUMENT**

The standards by which Plaintiffs' allegations must be measured are well

established.  While on a motion to dismiss plaintiffs' factual allegations must be accepted as true,

this applies only to well-pleaded allegations.  See Papasan v. Allain, 478 U.S. 265, 286 (1986).

"[L]egal conclusions, deductions or opinions couched as factual allegations are not given a

presumption of truthfulness."  Mason v. Am. Tobacco Co., 346 F.3d 36, 39 (2d Cir. 2003)

(quoting United States v. Bonanno Organized Crime Family of La Cosa Nostra, 879 F.2d 20, 27

(2d Cir. 1989)); see Papasan, 478 U.S. at 286.  A plaintiff, moreover, is not entitled to have

unreasonable inferences drawn in its favor on a Rule 12(b)(6) motion.  See First Nationwide

Bank v. Gelt Funding Corp., 27 F.3d 763, 771-72 (2d Cir. 1994) (court not required to draw

unreasonable inferences in plaintiff's favor).  Similarly, "subjective characterizations of

documents properly before" the court or allegations that are contradicted by such documents

need not be adopted.  Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 241 (S.D.N.Y.

2000) (citing Madonna v. United States, 878 F.2d 62, 65 (2d Cir. 1989)); see also In re Aegon

N.V. Sec. Litig., No. 03 Civ. 0603, 2004 WL 1415973, at *5 (S.D.N.Y. June 23, 2004) ("The

truth of factual allegations that are contradicted by documents properly considered on a motion

to dismiss need not be accepted.") (citation omitted); Rapoport v. Asia Elecs. Holding Co., 88 F.

Supp. 2d 179, 184 (S.D.N.Y. 2000) ("If . . . documents contradict the allegations of the amended

complaint, the documents control and this Court need not accept as true the allegations in the amended complaint.").

## I.    THE SECTION 10(b) AND RULE 10b-5 CLAIM MUST BE DISMISSED.

Plaintiffs allege that Jarden, JCS, and the Individual Defendants violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.  Lead Plaintiffs' claim must be dismissed because they do not adequately allege a material misrepresentation or omission, scienter or loss causation.

### A.    The Complaint Must But Fails To Allege A Material Misrepresentation Or Omission.

#### 1.    The Applicable Pleading Standards.

A plaintiff must plead that defendants made "a false material representation or omitted to disclose material information." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995).  These allegations must comply with the stringent pleading requirements imposed by the Private Securities Litigation Reform Act (the "PSLRA").  Pub. L. No. 104-67, 109 Stat. 737 (codified at 15 U.S.C. §§ 77k, 77l, 77z-1, 77z-2, 78a, 78j-1, 78t, 78u, 78u-4, 78u-5).  A complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

Additionally, complaints alleging securities fraud must satisfy the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure.  See Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001).  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  To state a securities fraud claim under Rule 9(b), a complaint must: "(1) specify the

3404165_33

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

"To fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)); see also Halperin v. eBankerUSA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002). The materiality of statements alleged to be misleading must be considered in context. Rombach, 355 F.3d at 172 n.7 ("The test for whether a statement is materially misleading under Section 10(b) . . . is 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'") (internal quotations omitted) (quoting I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991)). Thus, "[t]he touchstone of the inquiry is not whether isolated statements within a document were true" but whether a defendant's statements, considered in the aggregate, "would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Halperin, 295 F.3d at 357.

2.    The Complaint Does Not Adequately Allege Any Material Misrepresentation Or Omission.

a.    Allegations that the Company omitted to disclose that Holmes had not met internal sales projections are insufficient.

The first purported misstatement alleged in the Complaint is that Defendants failed to disclose at the time of the announcement of the acquisition that Holmes was experiencing declining demand for its products and was not meeting its internal sales projections.

- 12 -

(Compl. ¶¶ 37, 48.)  This allegation is allegedly based on information from a confidential
informant that in the first half of 2005 Holmes missed its projections "by about $20 million."
(Compl. ¶ 29.)  The Company had neither a duty to disclose this information, nor was it material.

Before an alleged omission of fact can be actionable under the federal securities
laws, "the omitted information must have been material <u>and</u> there must have been a duty to
disclose it."  <u>Levine v. NL Indus., Inc.</u>, 717 F. Supp. 252, 254 (S.D.N.Y. 1989) (emphasis
added), <u>aff'd</u>, 926 F.2d 199 (2d Cir. 1991) (citing <u>Basic</u>, 485 U.S. at 239 n.17 ("Silence, absent a
duty to disclose, is not misleading under Rule 10b-5.")); <u>see also</u> <u>Chiarella v. United States</u>, 445
U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no
fraud absent a duty to speak.").  The duty to speak arises only when it is "necessary to make a
statement made not misleading, or when a statute or regulation requires disclosure of the fact."
<u>Levine</u>, 717 F. Supp. at 254; <u>In re Ivan F. Boesky Sec. Litig.</u>, 825 F. Supp. 623, 635 (S.D.N.Y.
1993) (explaining that "corporations and their management are under no general duty to
disclose"); <u>see also</u> <u>Taylor v. First Union Corp. of S.C.</u>, 857 F.2d 240, 243-44 (4th Cir. 1988)
("Rule 10b-5 imposes such a duty to disclose only when silence would make other statements
misleading or false."); <u>Roeder v. Alpha Indus., Inc.</u>, 814 F.2d 22, 26 (1st Cir. 1987) ("When a
corporation does make a disclosure-whether it be voluntary or required-there is a duty to make it
complete and accurate.").

Here, nothing has been alleged from which it could be concluded that the
Company had a duty to disclose Holmes' internal sales projections or that Holmes was not
meeting those projections.  In the first place, there is no statute or regulation that requires
disclosure of the Company's internal projections or that undisclosed projections have not been
met.  <u>See</u> <u>In re N. Telecom Ltd. Sec. Litig.</u>, 116 F. Supp. 2d 446, 458-59 (S.D.N.Y. 2000)

- 13 -

(finding that the SEC has promulgated specific rules establishing mandatory disclosure obligations, and "[t]he federal securities laws do not obligate companies to disclose their internal forecasts.") (citations omitted); see also In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478, 2003 WL 22801416, at **4-5 (S.D.N.Y. Nov. 25, 2003). And there is certainly nothing that requires an acquiring company to disclose internal projections (or the failure to meet such projections) of a company it expects to acquire.[5]

Nor does the Complaint allege that the disclosure of this information was "necessary to make a statement not misleading." In this regard, the Complaint does not allege that Jarden disclosed any information about Holmes' expected or actual sales -- either prior to or after the Holmes acquisition. Thus, disclosure that Holmes purportedly was not meeting its internal sales projects was not required. Additionally, the Complaint does not allege that the Defendants were informed of Holmes' alleged failure to meet its internal sales targets in early 2005. Indeed, the Complaint alleges that prior to the acquisition, the sales projections were re-evaluated at the direction of Holmes' CFO before the "discovery" period when Jarden was "auditing" Holmes. (Compl. ¶ 29.) There is no allegation that Holmes did not meet the revised projections. In the absence of Defendants' knowledge that Holmes was not meeting its internal sales projections, there could not have been a duty to disclose that information. See, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., Inc., 75 F.3d 801, 812 (2d Cir. 1996) (finding that statements were not materially misleading and did not give rise to

---

[5]     Plaintiffs' allegations appear to be little more than a disguised breach of fiduciary duty claim asserting that the Defendants failed to disclose that adequate diligence was not done in connection with the acquisition. Such breach of fiduciary duty claims masquerading as disclosure claims are insufficient under the federal securities laws. See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477 (1977) (holding that Congress did not intend to "bring within the scope of Section 10(b) instances of corporate mismanagement"); Field v. Trump, 850 F.2d 938, 948 (2d Cir. 1988) ("Allegations that a defendant failed to disclose facts material only to support an action for breach of state-law fiduciary duties ordinarily do not state a claim under the federal securities laws. Certainly this is true of allegations of garden-variety mismanagement, such as . . . directors failing to adequately inform themselves . . . .") (internal quotations omitted).

- 14 -

duty to disclose where plaintiffs only offered conclusory allegations that defendants knew of the alleged sales decline).

Further, the alleged omitted information was not material to Jarden shareholders. Holmes' pre-acquisition sales were never included in Jarden's financial results. Therefore, there was not "a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Halperin, 295 F.3d at 357 (quoting Basic Inc., 485 U.S. 224, 231-32 (1988)). As to the allegations concerning Holmes' post-acquisition sales, they do not come close to meeting the specificity requirements of the PSLRA. The allegations as to Holmes' sales in August 2005 being "off by millions" (Compl. ¶ 31) and that Holmes was "feeling the effect of Hurricanes Katrina and Rita" (Compl. ¶ 33) are hopelessly vague and do not provide any basis from which to conclude that that information would have been material to Jarden shareholders. Indeed, nothing about Jarden's third quarter earnings release which consolidated Holmes' post-acquisition revenues has been characterized by Plaintiffs as negative.

　　　　b.　The forward-looking statements concerning expected synergies are not actionable.

The Complaint alleges that statements the Company made with respect to the cost savings expected from the merger had no reasonable basis. (Compl. ¶¶ 37, 48.) The only disclosure made by the Company of any substance concerning synergies is the statement made during a teleconference with analysts on June 29, 2005 that "[t]he Holmes transaction should offer a number of synergies. We have not fully quantified these yet, but are comfortable that we will achieve at least $15 million of cost savings within the next 24 months." (Compl. ¶ 35.)

Plaintiffs allege that Jarden was not likely to achieve the expected synergies as a result of the alleged failure of Holmes to meet its internal sales projections. (Compl. ¶¶ 37(b),

48.)  However, the fact that Holmes had supposedly not met its internal sales projections

provides no plausible basis from which to infer that synergies were not likely to be achieved

from the acquisition, especially during the two years mentioned in the Company's statement.

The inference that synergies would not be achieved within two years because of an alleged

pre-acquisition slow down in Holmes' sales is on its face unreasonable.  There is simply no

logical connection between those two matters.  As such, it provides no factual support for the

claim Plaintiffs purport to make.  See First Nationwide Bank, 27 F.3d at 771-72.  And it clearly

cannot satisfy the specificity requirements of the PSLRA.

      Moreover, the June 29, 2005 statement concerning synergies made explicit that

the Company did not expect those synergies to be realized immediately, but rather within 24

months.  (Compl. ¶ 35.)  Thus, almost a year still remains on the Company's timetable for

achieving the synergies.  Plaintiffs' conclusory prediction that synergies will not be realized is

based on nothing more than speculation and conjecture.  See, e.g., Bond Opportunity Fund v.

Unilab Corp., No. 99 Civ. 11074 (JSM), 2003 WL 21058251 (S.D.N.Y. May 9, 2003), aff'd 87

Fed. App'x 772 (2004) (finding that plaintiffs' claims failed to meet the pleading standard of the

PSLRA because, absent impermissible speculation, sufficient facts were set out to support the

conclusion that the statements were false and misleading); Feasby v. Industri-Matematik Int'l

Corp., No. 99 Civ. 8761 (HB), 2000 WL 977673 at *7 (S.D.N.Y. July 17, 2000) (disregarding

plaintiffs' allegations that were unsupported by any factual background as impermissible

speculation).

      Even if the Complaint alleged particularized facts showing synergies could not be

achieved within 24 months -- which it has not done -- these statements still would not support a

securities fraud claim because forward-looking statements like these are not actionable when

"accompanied by meaningful cautionary statements identifying important factors that could

cause actual results to differ." 15 U.S.C. § 78u-5(c)(1)(A) (2000); see also GSC Partners CDO

Fund II, Ltd. v. Washington, 368 F.3d 228, 242-43 (3d Cir. 2004); In re Aegon N.V. Sec. Litig.,

2004 WL 1415973, at *12.[6] Here, the statements were accompanied by just such language.[7]

      The October 27, 2005 press release identifies statements concerning synergies as

forward-looking statements and cautions that "Jarden's ability to integrate and obtain the

anticipated results and synergies from its acquisitions" is based upon "management's estimates

and assumptions" and are "inherently uncertain." Cahalan Aff., Ex. E (Form 8-K of Jarden

Corporation and Exhibit 99.1 thereto, filed Oct. 27, 2005), at 2. The press release further

cautions that actual results could vary and refers to the Company's periodic and other reports

filed with the SEC for a discussion of the factors that could affect results. Similarly, a June 29,

2005 press release[8] cautioned investors that the Company's statements concerning its "ability to

---

[6]    Prior to the enactment of the PSLRA, this Circuit provided protection for forward-looking statements under the "bespeaks caution" doctrine. See San Leandro Emergency Med. Group Profit Sharing Plan, 75 F.3d at 811 ("Liability may not be imposed based on statements that, considered in their entirety, clearly 'bespeak caution.'") (internal citations omitted). Under the bespeaks caution doctrine, the "touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Rombach, 355 F.3d at 173 (quotations and citations omitted). The first step in this inquiry is to identify the allegedly undisclosed risk. Halperin, 295 F.3d at 359. Then, the court should "read the allegedly fraudulent materials-including the cautionary language-to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." Id. The safe harbor provision and the bespeaks caution doctrine are now counterparts. Id.

[7]    Forward-looking statements are protected by the safe harbor provision "if one of three conditions are met: 1) the forward-looking statement is identified as such and accompanied by 'meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;' 2) the statement is 'immaterial'; or 3) the plaintiff fails to prove that the statement was made with actual knowledge that the statement was false or misleading." In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432, 448 (S.D.N.Y. 2005) (citing 15 U.S.C. § 78u-5(c)(1)).

[8]    Where plaintiffs proceed on a fraud-on-the-market theory, as Plaintiffs do here (Compl. ¶¶ 81, 82), the defendants' cautionary statements "must be treated as if attached to every one of its oral and written statements." In re eSpeed, Inc. Sec. Litig., No. 05 Civ. 2091, 2006 WL 880045, at *8 (S.D.N.Y. Apr. 3, 2006). A court must then consider whether any cautionary language provided by the defendants at any time sufficiently warned of the risk of which plaintiffs complain. Id. Additionally, cautionary statements

integrate and obtain the anticipated results from our acquisition of The Holmes Group . . . are

based on management's estimates and assumptions with respect to future events and financial

performance and are believed to be reasonable, though are inherently uncertain and difficult to

predict." Cahalan Aff., Ex. F (Form 8-K of Jarden Corporation and Exhibit 99.1 thereto, filed

June 29, 2005). The press release further cautions that actual results could vary and incorporates

by reference the factors that could lead to such a variation included in the Company's periodic

and other reports filed with the SEC. Id.

      For all of these reasons, Plaintiffs' allegations that the Company misrepresented

the synergies expected from the Holmes acquisition are insufficient.

      c.     The Company did not misstate Jarden's expected cash flow.

      Plaintiffs allege Defendants misrepresented and failed to disclose that Jarden

would not be able to meet its "projected results and cash flows" due to the adverse factors

impacting Holmes' business. (Compl. ¶¶ 37(c), 48.) Once again, the Complaint fails to allege

any misstatement.

      As an initial matter, the Complaint does not allege that the Company publicly

disclosed any specific "projected results", other than cash flow for the second half of 2005. With

respect to cash flow, it is alleged that in the release of its third quarter results on October 27,

2005, the Company stated that it was confident that it would achieve cash flow of $250 million

for the final two quarters of the year, with over $200 million in the fourth quarter. (Compl.

¶¶ 46, 47.) This claim, too, is easily disposed of because the Complaint itself shows that Jarden

achieved the $250 million in cash flow. The Complaint alleges that Jarden generated $48 million

in operating cash flow in 3Q, (Compl. ¶ 49) and the January 12, 2006 release that is quoted by

---

in SEC filings may be incorporated by reference. See In re Midway Games, Inc. Sec. Litig., 332 F. Supp.
2d 1152, 1167 (N.D. Ill. 2004).

Plaintiffs explicitly states that over $200 million of cash flow was realized by the Company in 4Q.  Cahalan Aff., Ex. B (January Press Release), at 1; see also Cahalan Aff., Ex. C (January Analyst Call Transcript), at 2.

        d.     The allegations referring to Holmes' expected 2005 EBITDA are not actionable.

The first of these consolidated class action lawsuits alleged that the Company had misled investors as to Holmes' expected 2005 EBITDA at the time of the announcement of the Holmes acquisition on June 29, 2005.  See Cahalan Aff., Ex. G (Darquea v. Jarden Corp, et al, Class Action Complaint, dated Jan. 30, 2006), at ¶¶ 8, 36.  The Complaint here, however, makes only a passing reference in the introduction to such a claim.  (Compl. ¶ 12.)  This allegation is not repeated later in the Complaint, and no factual support for the claim is alleged.  In fact, the Complaint does not refer to any disclosure of the projected EBITDA of Holmes for 2005.  The Complaint does correctly allege that disclosure was made of Holmes' 2004 historical EBITDA (Compl. ¶ 35).  But the Complaint does not aver that this disclosure was inaccurate.[9]

        3.     The Claim Against JCS Must Be Dismissed Because There Is No Allegation That JCS Made Any Representation.

The claim against Defendant JCS must be dismissed for an additional reason.  The Complaint does not allege that JCS made any representation -- let alone a misrepresentation -- or had any involvement in any of the statements at issue in the Complaint.  The Complaint only alleges that after the acquisition of Holmes, officers of JCS attended weekly meetings that concerned the "financial progress" of Holmes.  (Compl. ¶ 32.)  This is clearly not enough to hold JCS liable.

---

[9]     The Complaint further alleges that the Company disclosed that "Holmes's historical adjusted EBITDA margins of 13 to 14% will help Jarden drive towards its overall EBITDA margins."  (Compl. ¶ 35.)  Again, it is not alleged that this statement of Holmes' historical EBITDA margins was inaccurate.

3404165_33

In <u>Wright v. Ernst & Young LLP</u>, 152 F.3d 169, 175 (2d Cir. 1998), the Second Circuit adopted a bright line rule for imposing primary liability under Section 10(b). "A defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)" and must "know or should know that this representation would be communicated to investors." (internal quotations omitted) <u>Id.</u> at 175. [10]  The Second Circuit, without referring to <u>Wright,</u> subsequently held that a defendant may be liable under Section 10(b) for a statement not specifically attributed to the defendant in the disclosure if there are particularized facts showing that the defendant was involved in disseminating the misleading statements.  <u>See</u> <u>In re Scholastic Corp. Sec. Litig.</u>, 252 F.3d 63, 75-76 (2d Cir. 2001) (holding that the vice president of a company who was alleged to be primarily responsible for the company's communications with investors and analysts and to be involved in the drafting, producing, reviewing and/or disseminating of the false statements could be held liable for a primary violation).  Here, there are no allegations that JCS was involved in any way in the dissemination of any purported misleading statements.

Further, Plaintiffs do not allege that JCS owed any duty to Jarden shareholders to disclose any of the allegedly omitted facts.  A subsidiary of a public company does not owe a disclosure duty to the shareholders of its parent.  <u>See</u> <u>Ravens v. Republic N.Y. Corp.</u>, No. CIV A. 99-4981, 2002 WL 1969651, at *14 (E.D. Pa. Apr. 24, 2002) (Section 10(b) claims against subsidiary dismissed where, as here, subsidiary had no duty of disclosure to the shareholders of the parent company); <u>Lindblom v. Mobile Telecomms. Techs. Corp.</u>, 985 F. Supp. 161, 163

---

[10]     As the Supreme Court made clear, there is no private cause of action against aiders and abettors of Section 10(b) violations.  <u>Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 191 (1994).

(D.D.C. 1997) ("A subsidiary owes no duty of disclosure to the shareholders of the parent whose own stock is the only stock being offered for purchase or sale.").

B.     <u>The Complaint Fails To Allege That Any Defendant Acted With Scienter.</u>

    Plaintiffs' Section 10(b) claim should also be dismissed because the Complaint fails adequately to allege scienter.

1.     Applicable Standards For Scienter Under The PSLRA.

    Under the PSLRA, securities fraud plaintiffs are required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); <u>see also</u> <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994). "The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b-5, that the plaintiff must allege is an intent to deceive, manipulate or defraud." <u>Kalnit</u>, 264 F.3d at 138 (internal quotations omitted). A strong inference of scienter must be alleged separately as to *each defendant*. <u>In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.</u>, 272 F. Supp. 2d 243, 262 (S.D.N.Y. 2003) ("[T]o establish scienter in misrepresentation cases, facts must be alleged which particularize how and why *each defendant* actually knew, or was reckless in not knowing, that the statements were false at the time made . . . .") (alteration and emphasis in original). There is no such thing as a group pleading of scienter. <u>In re AFC Enters., Inc. Sec. Litig.</u>, 348 F. Supp. 2d 1363, 1371 (N.D. Ga. 2004) ("It is important to note that the group pleading doctrine allows attribution of statements to individual defendants; it has no application to the determination of scienter as to individual defendants.").

    Scienter may generally be established in either of two ways: either by alleging facts that (a) constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (b) show that defendants had both motive and opportunity to commit fraud. <u>Chill v. Gen. Elec. Co.</u>, 101 F.3d 263, 267 (2d Cir. 1996) (quoting <u>Shields</u>, 25 F.3d at 1128). Recklessness "is

3404165_33

at the least, conduct which is highly unreasonable and which represents an extreme departure

from the standards of ordinary care to the extent that the danger was either known to the

defendant or so obvious that the defendant must have been aware of it." In re Carter-Wallace,

Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (citing Rolf v. Blyth, Eastman Dillon & Co., 570

F.2d 38, 47 (2d Cir. 1978)) (internal quotations omitted).  The standard of scienter is even higher

with respect to the forward-looking statements that Plaintiffs claim were false.  Plaintiffs must

allege particularized facts creating a strong inference that each statement was made with actual

knowledge that the statement was false or misleading.  In re GeoPharma, Inc., 399 F. Supp. 2d at

448 (citing 15 U.S.C. § 78u-5(c)(1)); In re Aegon, 2004 WL 1415973 at *12.  Scienter, whether

it be recklessness, conscious misbehavior or actual knowledge, may not be inferred on the basis

of hindsight.  "Fraud by hindsight" has universally been held to be an insufficient basis on which

to infer scienter.  See Shields, 25 F.3d at 1128 (holding that allegations of fraud by hindsight

failed to plead reckless behavior); In re Carter-Wallace, 220 F.3d at 42 (same).

<div style="margin-left:2em">

2.      **The Complaint Does Not Allege Particularized Facts Creating a Strong Inference that Defendants Had Actual Knowledge or Were Reckless.**

a.      The Complaint's boilerplate allegations of knowledge or recklessness are not sufficient.

</div>

The Complaint alleges that the Individual Defendants, as senior executives of

Jarden, were "privy to non-public information concerning Jarden[]."  (Compl. ¶ 24.)  In addition,

Plaintiffs conclusorily assert that Defendants received "information reflecting the true facts

regarding Jarden", were "privy to confidential proprietary information concerning Jarden" and

"participated in the fraudulent scheme".  (Compl. ¶ 71.)  Such boilerplate allegations based on

corporate position do not satisfy the requirement of the PSLRA that particularized facts raising a

strong inference of scienter be alleged.  See In re Aegon, 2004 WL 1415973 at *17 (holding that

allegations that defendants had access to adverse nondisclosed information by virtue of their

senior position with the company are insufficient to establish scienter); see also In re Nokia Oyj

(Nokia Corp.) Sec. Litig., 432 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (holding that allegations

that defendants knew or should have known that they were misrepresenting material facts based

on their senior positions in the company were insufficient as a matter of law to establish

scienter); In re Criimi Mae, Inc. Sec. Litig., 94 F. Supp. 2d 652, 661 (D. Md. 2000) (allegations

that defendants "must have known" that corporate statements were false by virtue of their

corporate positions were "inadequate to withstand the special pleading requirements in securities

fraud cases"); Smith v. Circuit City Stores, Inc., 286 F. Supp. 2d 707, 715 (E.D. Va. 2003)

("Guesswork . . . based on the [corporate] position of the Defendants is insufficient [to establish

scienter]").

> b.    The Complaint does not contain particularized facts showing that
>        Defendants were reckless or had actual knowledge with respect to
>        the alleged omissions concerning Holmes' failure to meet internal
>        sales projections.

The Complaint does not allege that any of the Defendants was aware that Holmes'

sales fell $20 million short of its projections in early 2005. There is no allegation that Plaintiffs'

confidential informant, an officer of Holmes prior to the acquisition, shared this information with

any of the Defendants. Further, there are no facts alleged demonstrating that the Defendants

were reckless in not learning this purported fact. To the contrary, the Complaint specifically

alleges that Holmes re-evaluated its sales projections in advance of the April/May 2005 pre-

acquisition due diligence conducted by the Company. (Compl. ¶ 29.)

As to the allegation that by August "each division of Holmes were 'off by

millions'" (Compl. ¶ 31), the Complaint does not allege that this vague information was

provided to Jarden or the Individual Defendants. Nor could any knowledge of JCS be imputed to

Jarden or the Individual Defendants. See In re Baesa Sec. Litig., 969 F. Supp. 238, 242

3404165_33

(S.D.N.Y. 1997) ("Even where plaintiffs have succeeded in alleging actionable fraud at a

subsidiary, that "fraud cannot be automatically imputed to its corporate parent."); see also Chill,

101 F.3d at 268 ("Ultimately, whether [a subsidiary] defrauded plaintiffs and whether its parent

. . . defrauded plaintiffs are different questions."); In re Comshare Inc. Sec. Litig., 183 F.3d 542,

553-54 (6th Cir. 1999) (parent company's scienter for revenue-reporting fraud at foreign

subsidiary could not be established by conclusory allegations of knowledge and recklessness).

> c.   The Complaint does not allege particularized facts creating a
> strong inference that Defendants had actual knowledge that the
> expected synergies were not achievable.

The Company's statements regarding synergies were forward-looking.  As a

result, Plaintiffs must allege particularized facts showing that these statements were made with

actual knowledge that they were false.  See 15 U.S.C. § 78u-5(c)(1); see also In re GeoPharma,

399 F. Supp. 2d at 448; In re Aegon, 2004 WL 1415973, at *12.  The Complaint does not satisfy

this exacting standard.  The only purported fact that the Complaint alleges in this regard is that

Jarden "was not likely to achieve the expected synergies from the Holmes acquisition" as a result

of the alleged failure of Holmes to meet its internal sales projections.  (Compl. ¶¶ 37, 48.)  But,

as discussed above, there are no particularized factual allegations that Defendants were aware

that Holmes would not meet its internal sales projections.  And even if the Complaint included

such allegations, there is no connection between a sales short fall and the synergies the Company

said it expected to realize.

Plaintiffs cannot allege actual knowledge for another equally basic reason.  The

Company stated that it expected the cost cuts to be realized within 24 months and that period is

almost a year away.  Any claim that the synergies will not be achieved is purely speculative at

this time.  See, e.g., Chill, 101 F.3d at 267 (finding no license to base claims of fraud on

"speculation and conclusory allegations."); Nelson v. Stahl, 173 F.Supp.2d 153, 167 (S.D.N.Y.

3404165_33

2001) ("[i]t is not sufficient for a plaintiff to plead scienter with allegations that are conclusory or based on speculation.")

        d.     The Complaint does not and cannot possibly allege actual knowledge that the cash flows would not be met.

There are similarly no allegations which demonstrate that Defendants had actual knowledge that Jarden would not achieve the expected cash flows for the third and fourth quarters of 2005 or even that they were reckless in this regard.  The only ones that were reckless were Lead Plaintiffs in making this demonstrably false claim.  As noted above, the cash flow that was projected was achieved.  See Cahalan Aff., Ex. B (January Press Release), at 1; see also Cahalan Aff., Ex. C (January Analyst Call Transcript), at 2.[11]

        3.     The Complaint Fails To Adequately Allege That Defendants Had Motive And Opportunity To Commit Fraud.

"Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged." Kalnit, 264 F.3d at 139 (internal quotations omitted).  While "particular facts demonstrating a motive and opportunity to commit fraud (or lack of such facts) may be relevant to the scienter inquiry," Ottmann v. Hanger Orthopedic Group, Inc., 353 F. 3d 338, 345 (4th Cir. 2003), generalized allegations of motive "shared by all companies" are legally insufficient. Id. at 352.

Plaintiffs allege that Defendants were motivated to commit fraud "because their compensation was tied to the price of Jarden stock." (Compl. ¶ 73.)  A desire by corporate executives to increase a Company's stock price does not, however, constitute motive to commit fraud.  Nor do Plaintiffs' factual allegations provide a shred of support for such an assertion.

---

[11]     In addition, there are simply no allegations that any of the Defendants had actual knowledge that the undisclosed internal projections of Holmes' EBITDA for 2005 were not achievable.

a.    The alleged restricted stock grants do not create a strong inference of motive.

The Complaint alleges that under his 2004 employment agreement, Franklin was granted 525,000 shares of restricted stock with the restrictions to lapse on January 1, 2005, 2006 and 2007, and on August 5, 2004, he was granted an additional 100,000 shares of restricted stock with the restrictions to lapse when the Company's shares reached a specified share price. (Compl. ¶ 74.)  It is alleged that the Compensation Committee subsequently modified the vesting terms of the restricted stock, as a result of which the restrictions lapsed upon the closing of the AHI acquisition on January 24, 2005, rather than when the shares reached the specified price. (Id.)  The Complaint does not allege how any of this supposedly created a motive for the Defendants to commit fraud.  Indeed, the Complaint makes clear that these shares vested six months prior to the Holmes acquisition and that this vesting was not dependent upon an increase in the price of the shares during the Class Period.

The Complaint also alleges that in their January 24, 2005 employment agreements, Franklin and to Ashken were granted additional shares of restricted stock (Franklin 915,000 shares, Compl. ¶ 75,, (Ashken 380,000 shares, Compl. ¶ 76), with the restrictions to lapse when Jarden's share price reached specified levels.  This, according to Plaintiffs, incentivized the Individual Defendants to misrepresent facts concerning Holmes in order to boost the price of the stock.  This contention fails as a matter of law.  As the case law makes crystal clear, the fact that an executive's compensation is positively affected by an increase in share price is not enough to show motive.  See Acito, 47 F.3d at 54 ("The existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter.");  see also, Rombach, 355 F.3d at 177 ("Even if the complaint is read to say that defendants artificially inflated Family Golf's stock price to increase their personal compensation

. . . [it] would still fail to allege the requisite motive: 'If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'") (quoting Acito, 47 F.3d at 54); Phillips v. LCI Int'l, Inc., 190 F.3d 609, 622 (4th Cir. 1999) ("allegations that corporate officers were motivated to defraud the public because an inflated stock price would increase their compensation" are insufficient to establish scienter) (internal quotations omitted).

Further, as the Complaint alleges, the 2005 stock grants occurred approximately six months before the Holmes acquisition. (Compl. ¶¶ 75, 76.) The restrictions on 50% of these shares were to lapse when the Company's share price reached $50 per share for 10 consecutive trading days (Compl. ¶ 77), and the Company's stock price reached $51.34 by the announcement of the Holmes acquisition (Compl. ¶ 79). It is noteworthy that the vesting price on the first 50% of the restricted shares, was changed only when Franklin and Ashken agreed in June, 2005 to increase the price at which the restrictions would lapse to $56. See Cahalan Aff. Ex. D (Amended Restricted Stock Agreement, demonstrating that the vesting price was changed as of June 23, 2005 to $56.). [12] The willingness of corporate executives to raise the price at which restricted shares vest is hardly consistent with a motive to commit fraud.

      b.    The Individual Defendants' compensation and bonus arrangements do not create a strong inference of motive.

The salary and bonus provisions of the Individual Defendants' January 24, 2005 employment contracts also do not provide a basis to infer motive. The salary increase was set on January 24, 2005 -- more than six months prior to the Holmes' acquisition. (Compl. ¶ 75.) The Complaint also admits that the bonuses were payable upon meeting certain annual budget targets, not upon raising the price of the stock. (Compl. ¶ 75.) There are no allegations that any of the

---

[12]      There is no allegation that the restrictions on the other 50% ever lapsed. See supra at footnote3.

alleged misrepresentations or omissions enabled the Company to meet budget targets or allowed the Individual Defendants to obtain larger bonuses. Additionally, any generalized allegations concerning the desire of Franklin or Ashken to increase performance of the Company or meet budget targets do not constitute a motive to commit fraud because these goals, too, are held by all executives. See In re Keyspan Corp. Sec., 383 F. Supp. 2d 358, 381 (E.D.N.Y. 2003) ("[a] plaintiff cannot allege motive by pointing to incentives possessed by nearly all corporate insiders"); Chill, 101 F.3d at 268 ("[t]he motive to maintain the appearance of corporate profitability or of the success of an investment, will naturally involve[d] benefit to a corporation, but does not 'entail concrete benefits.'")

        c.     The Individual Defendants' stock sales do not create a strong inference of motive.

The Complaint alleges that on August 1 and 2 and on November 4, 2005, Franklin and Ashken sold an aggregate of 207,000 and 166,500 shares, respectively. (Compl. ¶ 80.) These sales were all made shortly after the Company's second and third quarter earnings releases which were issued on July 28, 2005 (Compl. ¶ 39) and October 27, 2005 (Compl. ¶ 46). The alleged stock sales by the Individual Defendants do not provide a basis to infer motive.

The mere allegation that a corporate insider sold company stock is not sufficient to raise a strong inference of scienter. Acito, 47 F.3d at 54; see also In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d at 382 ("'[T]he mere fact that insider stock sales occurred does not suffice to establish scienter.'") (quoting Ressler v. Liz Claiborne, Inc., 75 F. Supp.2d 43, 58 (E.D.N.Y. 1999)); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092 (9th Cir. 2001) ("Insider stock sales are not inherently suspicious."). In order for such sales to create an inference of scienter, they must be "unusual." See Acito, 47 F.3d at 54 (holding that insider trading must be "unusual" to permit an inference of bad faith and scienter); see also In re MSC Indus. Direct Co., Inc., 283

F. Supp. 2d 838, 848 (E.D.N.Y. 2003) ("To show motive based on stock sales, the plaintiff must allege that the sales were unusual.") (internal quotation and citation omitted); In re Alpharma, Inc. Sec. Litig., 372 F.3d 137, 152 (3d Cir. 2004) (holding that trading by corporate officers must be "unusual in scope" or "timing" to permit an inference of scienter).

The Complaint does not even conclusorily allege that Franklin or Ashken's sales were unusual, let alone include particularized facts that would support such an accusation. All that Plaintiffs allege is that the stock sales were substantial. But this is plainly insufficient. See In re Sina, 2006 WL 2742048, at *4, 11 (S.D.N.Y. Sept. 26, 2006) (holding that allegations that insider defendants sold $35 million of stock during the class period were insufficient); In re eSpeed, 2006 WL 880045, at *14 (holding that allegations of defendants combined proceeds of $2.8 million did not suffice in isolation to establish scienter); In re Keyspan, 383 F. Supp. 2d at 382 ("[P]laintiffs do not adequately plead that defendants, individually or collectively, sold a large percentage of their total shares; large dollar amounts, standing alone, typically do not suffice to establish motive."); Ressler, 75 F. Supp. 2d at 60 (holding that large proceeds from stock sales are not suspicious per se).

Notably, the Complaint does not allege (i) that the Individual Defendants sold a substantial portion of their holdings, see In re MSC Indus. Direct Co., 283 F. Supp. 2d at 848 (noting that plaintiffs did not allege the percentage of their shares the defendants sold and finding the allegations insufficient to show that defendants' stock sales were unusual); (ii) that the present holdings of the Individual Defendants are substantially less than prior to the sales, see In re Keyspan, 383 F. Supp. 2d at 383 (finding that defendants owned more shares at the end of the class period and that this undermined plaintiffs' motive allegations based on stock sales); (iii) that the sales were inconsistent with the Individual Defendants' previous trading history, see

In re Sina, 2006 WL 2742048, at *11 (taking judicial notice of defendants' prior consistent trading practices and holding that defendants' trading activity was not unusual); or (iv) that the timing of the sales was unusual, see Ressler, 75 F. Supp.2d at 60 (finding that the timing of the sales did not coincide closely with any of the alleged false comments).[13]  In short, the Complaint does not allege any facts demonstrating that the sales were unusual in any way.

It is not surprising that Plaintiffs do not allege these facts.  As the Company's SEC filings reveal, as of April 15, 2005, Franklin held 3,143,635 shares of the Company, as adjusted for the 3 for 2 common stock split, which occurred in July 2005, and Ashken held 918,660 shares.  See Cahalan Aff. Ex. H (Excerpt from Form 14A Definitive Proxy Statement, filed May 9, 2005).  Thus, according to the allegations in the Complaint, Franklin only sold 6.6% of his holdings and Ashken sold 15.1%.  See Acito, 47 F.3d at 54 (finding allegations that defendant sold 11% of his stock during the class period insufficient to establish scienter); In re Keyspan, 383 F. Supp. 2d at 382-83 (noting that defendants sold less than 20% of their available holdings and that courts have found no inference of scienter in cases involving even greater percentages of sales).  Furthermore, on April 19, 2006, Franklin held 3,102,065 shares and Ashken held 1,099,031.  See Cahalan Aff. Ex. I (Excerpt from Form 14A Definitive Proxy Statement, filed Apr. 19, 2006).  Therefore, Ashken held more Company shares in April 2006 than he did in June 2005 and Franklin held only slightly less.  This completely undermines Plaintiffs' allegations that Defendants sought to enrich themselves by unloading stock before the disclosure of negative information.

---

[13]    As noted above, the Complaint makes clear that the alleged sales occurred shortly after the release of the 2Q and 3Q earnings.  (See Compl. ¶¶ 39, 46.)  There are no allegations that Defendants sold their shares in close proximity to the alleged disclosure of the "truth" on January 12, 2006.  See Ressler, 75 F. Supp. 2d at 60 (holding that the "timing [did] not suggest that defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price").

3404165_33

Finally, Plaintiffs ignore the fact that the stock sales by the Individual Defendants were not inconsistent with those made by them in prior years. As the Company disclosed, the sales at issue were made pursuant to 10b5-1 plans for the period July 2005 through October 2006. These programs were structured in substantially the same way as their previous 10b5-1 plans, although the typical number of shares being sold on a quarterly basis was reduced by approximately 33% from the previous 10b5-1 plans. See Cahalan Aff. Ex. J (Press release titled Jarden Corporation Executive Officers Adopt 10b5-1 Plans, dated July 8, 2005).[14]

### C.    The Complaint Does Not Adequately Allege Loss Causation.

Plaintiffs must also "prove that the defendant's fraud caused an economic loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 338 (2005); see also 15 U.S.C. § 78u-4(b)(4). A plaintiff must at least provide "some indication of the loss and the causal connection that the plaintiff has in mind." Dura Pharm., 544 U.S. at 347. More specifically, "a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (S.D.N.Y. 2005) (internal citation and quotations omitted) (emphasis in original).

While Plaintiffs allege that Jarden's stock price dropped after the Company's third quarter earnings release on October 27, 2005, they do not allege that there was any "corrective disclosure" by the Company in that release. Indeed, both the press release and the earnings conference call on October 27, 2005 contain only positive information regarding the

---

[14]    Under the Plans, Franklin and Ashken committed in advance to the sale each quarter of prearranged amounts of stock. Franklin and Ashken have maintained 10b5-1 plans providing for a quarterly sale of shares since 2002. See, e.g. Cahalan Aff. Ex. K (Form 8-K of Jarden Corporation, filed November 1, 2002).

3404165_33

Company.  (Compl. ¶ 46-47.)  The Complaint itself explains, based on a quote from CIBC, that the stock price dropped not because Jarden did not reach its cash flow forecasts, but rather because investors had anticipated results higher than the forecast.  (Compl. ¶ 49.)

          The Complaint also fails to allege that the stock drop after the January 12, 2006 release and conference call was caused by a "corrective disclosure" that revealed the true facts allegedly omitted or misrepresented.  The January 12, 2006 release and conference call did not address the pre-acquisition sales shortfall by Holmes; did not disclose that the Company would not achieve the synergies expected from the acquisition; and did not disclose that the Company would not meet the cash flow guidance for Q3 and Q4 of 2005.  Indeed, the January 12, 2006 press release continued to express confidence in the future synergies to be realized from the Holmes acquisition (Compl. ¶57) and made clear that the projected cash flow had been achieved.  See Cahalan Aff., Ex. B (January Press Release), at 1; see also Cahalan Aff., Ex. C (January Analyst Call Transcript), at 2.

          What the Complaint does allege is that the January 12, 2006 conference call announced that Holmes' EBITDA had fallen short of internal projections by approximately $15 million.  (Compl. ¶ 54.)  However, as set forth above, the Plaintiffs have set forth no argument and surely no particularized facts that demonstrate that the Defendants made any actionable misrepresentations or omissions concerning Holmes' projected EBITDA for 2005.

## II.    PLAINTIFFS' CLAIM UNDER SECTION 20(a) OF THE EXCHANGE ACT MUST BE DISMISSED.

          Plaintiffs assert controlling persons claims under Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)) against Jarden and the Individual Defendants.  These claims must be dismissed.

3404165_33

       To state a claim under Section 20(a), a plaintiff must allege:  (i) an underlying primary violation of the securities laws by the controlled person; (ii) control over the controlled person; and (iii) particularized facts as to the controlling person's culpable participation in the violation of the controlled person. Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998); see also Elliott Assocs., L.P. v. Convance, Inc., No. 00 Civ. 4115, 2000 WL 1752848 (SAS), at *11 (S.D.N.Y. Nov. 28, 2000).  As set forth above, Plaintiffs fail to allege a primary violation of the Exchange Act by Jarden or JCS, the purported controlled persons here.  (See Compl. ¶ 97.)  As a result, all Section 20(a) claims should be dismissed.

       Additionally, the Section 20(a) claims fail because they do not adequately allege that Jarden or the Individual Defendants  were "culpable participants" in the alleged Exchange Act violations.  See Elliott Assocs., 2000 WL 1752848, at *11 n.15 (noting that to state a prima facie case under Section 20(a), a plaintiff must also show "culpable and meaningful participation in addition to control status").  For this reason also, Plaintiffs' Section 20(a) claims must be dismissed.

3404165_33

## CONCLUSION

For the foregoing reasons, Defendants request that this Court grant their Motion

to Dismiss the Complaint with prejudice and grant such other and further relief as this Court

deems just and proper.

Dated:        October 20, 2006
              New York, New York


                              WILLKIE FARR & GALLAGHER LLP


                              By: _____
                                   Stephen Greiner (SG-4287)

                              787 Seventh Avenue

                              New York, New York 10019

                              (212) 728-8000

                              Attorneys for Defendants

- 34 -

EXHIBIT A

## CERTIFICATE OF SERVICE

The undersigned, a member in good standing of the bar of this Court, certifies that on October 20, 2006, she caused a copy of: (i) the Notice of Defendants' Motion to Dismiss the Complaint; (ii) the accompanying Affidavit of Eilish M. Cahalan, sworn to on October 20, 2006, and the exhibits annexed thereto; and (iii) the Memorandum of Law in Support of Defendants' Motion to Dismiss to be served by first-class United States mail upon the following:

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
Samuel H. Rudman, Esq.
58 South Service Road, Suite 200
Melville, NY 11747

SCHRIFFRIN & BARROWAY, LLP
Katharine M. Ryan, Esq.
Karen E. Reilly, Esq.
280 King of Prussia Road
Radnor, PA 19087

SULLIVAN, WARD, ASHER & PATTON, P.C.
Cynthia J. Billings, Esq.
25800 Northwest Highway
1000 Maccabees Center
Southfield, MI 48075-1000

SCHRECK BRIGNONE
Andrew S. Brignone, Esq.
300 S. Fourth Street, Suite 1100
Las Vegas, NV 89101


Eilish M. Cahalan