UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
ERNESTO DARQUEA,

                     Plaintiff,

              - against -                         06 CV 0722 (CLB)
                                                    (Consolidated)

JARDEN CORP., et al.,                           ***Memorandum and Order***

                     Defendants.
---------------------------------------------------------x

<u>Brieant, J</u>.

      Before the Court in this consolidated federal securities fraud class action is a motion filed October 20, 2006 (Doc. 28) to dismiss the Complaint brought under Rule 12(b) of the Federal Rules of Civil Procedure ("FRCP"). The action is brought on behalf of all persons who purchased or otherwise acquired the common stock of Jarden between June 29, 2005, and January 11, 2006 (the "Class Period"), and alleges violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("the Act"), and of Rule 10b-5. No motion for class certification has yet been filed.

      The following facts are either undisputed or presumed true for purposes of this motion only. Defendant Jarden ("the Company") is a global provider of consumer products from brands such as *Ball* (home canning jars), *Mr. Coffee*, *Sunbeam*, *Coleman* (camping gear) and several others.[1] Jarden's shares are listed on the New York Stock Exchange. Defendant Martin Franklin

---

[1] Jarden was known as the "Alltrista Corporation" prior to its name change to Jarden in 2002.

is the Chairman and CEO of the Company. Defendant Ian Ashken is the Vice-Chairman, CFO and Secretary of the Company. Defendant Jarden Consumer Solutions ("JCS") is a wholly-owned subsidiary of Jarden (together "Jarden").

In 2000, Defendants Franklin and Ashken launched a hostile takeover bid, intending to buy the Company and take it private. Upon agreement to keep the Company public, Franklin was given two seats on the Company's Board in June of 2001. Thereafter Franklin and Ashken were made CEO and CFO, respectively, of Jarden.

On January 24, 2005, for a cost of $846 million, Jarden acquired the former *Sunbeam* Corporation, which emerged from bankruptcy under the name of American Household Incorporated ("AHI"). Compl. ¶5. The AHI acquisition was financed in part by a private equity transaction for a capital infusion of $350 million, which required Jarden to create new classes of in-kind dividend paying preferred stock, the appointment of a designated representative on Jarden's Board, and by its terms, restricted Jarden's ability to raise additional funds for any future acquisitions. Compl. ¶6. The additional funds needed to acquire AHI were raised by Jarden's refinancing of its existing debt, which required the Company to maintain certain debt-to-cash flow ratios, to be maintained in order to comply with a credit agreement, keyed to Jarden's Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA").

After the AHI acquisition, Defendants were approached by the owners of a privately held company, the Holmes Group ("Holmes"), who were interested in combining the business with

JCS. Andy Hill, who was the former president of AHI and was then president and CEO of JCS, was familiar with Holmes, due to AHI's prior consideration of acquiring Holmes during Hill's tenure with AHI. Compl. ¶8.

On June 29, 2005, the Company announced an agreement to acquire the Holmes Group, which includes product brands such as *Crock-Pot* slow cookers, *Rival* roasters and *Bionaire* air purifiers. Plaintiffs allege that Defendant represented publicly that the acquisition would be "immediately accretive to earnings" and would permit Jarden to take advantage of product and management synergies between the two entities. On July 18, 2005, Berkshire Partners LLC announced the completed sale of the Holmes Group to Jarden for approximately $420 million in cash and 6.2 million shares of Jarden common stock.

Plaintiffs allege that by at least the start of the Class Period (June 29, 2005), Defendants knew or should have known that the claimed synergies did not exist, that Holmes would not meet its sales and other key financial projections, and that the acquisition would adversely affect Jarden's profitability.

On June 29, 2005, Jarden issued a press release in which it reported that it had agreed to buy the Holmes Group for $625 million, consisting of $420 million in cash and 4.1 million shares of Jarden common stock. It stated:

> The transaction is expected to be immediately accretive to earnings and close during the third quarter, subject to customary closing conditions. The Company's waiting period for Hart-Scott-Rodino approval has already expired.

>          *               *               *
> 
> Holmes has annual revenues of approximately $700 million and an adjusted non-GAAP EBITDA [earnings before interest, taxes, depreciation and amortization] of approximately $95 million. Based on a $625 million enterprise value for the business, the acquisition multiple is approximately 6.5 times the adjusted non-GAAP EBITDA run rate, before any synergies.

Compl. ¶34.

During a teleconference held that same day with analysts to discuss the Holmes acquisition, Defendant Franklin stated:

> The business has impressive cash flows in the second half of the year and the management team is strong, experienced and eager for the opportunity to take Holmes brands to the next level. Importantly, Holmes has a similar entrepreneurial cultural culture [*sic*] to that of Jarden, which bodes well for maximizing the synergistic opportunities the transaction will create.
> 
> From a financial as well as operational perspective, we believe that the Holmes acquisition is extremely attractive for our existing and new shareholders. The transaction further diversifies our product offerings giving us annualized revenue run-rate of approximately $3.4 billion. The gross margins are similar to our existing business at 27% but the transaction will help improve the time line we established for following the American Household acquisition of returning Jarden to 15% + EBITDA margins within the next three to five years. It is not a usual custom to give guidance to the Street. But with June drawing to a closing and given the size of this transaction, I have asked Ian [Ashken] to give you a brief overview of Jarden's Q2 outlook and the impact of the Holmes transaction on earnings for 2005.

During the same call, Defendant Ashken stated:

> The Holmes transaction should offer a number of synergies. We have not fully quantified these yet, but are comfortable that we will achieve at least $15 million of cost savings within the next 24 months. This will further help to expand margins. Holmes' historical adjusted EBITDA margins of 13 to 14% will help Jarden drive towards its overall EBITDA margins.

In response to a question from a representative of CIBC World Market regarding how

quickly the deal came together and inquiring into the familiarity of the Officers with operations, Franklin replied:

> Well that is a good question. But we - first of all I would say that the American Household guys are very familiar with it, because of all their history. And second we have been aware of it for well over a year. We had not pursued it and quite frankly if we did not own - if we had not bought American Household and owned Sunbeam, we probably would not have pursued it. I mean the whole logic here was the combination and how it strengthens and enhances our ability to improve margins in what was Sunbeam. So in terms of due diligence, again Ian and I and our team, you know, we have been doing this due diligence with the same hands-on approach that we have on the other transactions. I was in China. I walked the facilities. I visited their offices in Hong Kong. I have been up to Boston - kicked the tires, met the management teams. We have done all the things that we would do to get to know a business and felt very comfortable. In fact I would tell you that the more we got to know the business, the better we felt about it. It is a really first-class team of operators inside that business.

Plaintiffs claim that as a result of Defendants' June 29, 2005 statements, Jarden's stock price rose from $50.22 per share (on the previous trading day) to $55.20 per share on June 29, 2005.

On July 28, 2005, Defendants conducted an earnings conference call with analysts to discuss Jarden's Q2 2005 performance, during which Defendant Ashken stated:

> One of the key metrics we use that impacts the balance sheet is maintaining our debt to EBITDA ratio of no higher than approximately 3.5 to 1. ...This is a qualitative difference between Jarden and certain other acquisition-oriented companies. Not only are we disciplined in how we buy businesses, especially our 5 to 7 times EBITDA multiples on historical run rates, pre-synergies, but also our relatively conservative leverage helps us maintain a low risk profile, particularly in light of Jarden's historically strong free cash flow.

During that same call, in response to an analyst's question concerning whether weak earnings in the consumer sector were reflected in the Company's trends, Defendant Franklin

stated:

> Let me tell you, I'm glad you asked that question. Our third quarter, as we see it at the moment, our retailers, it is trending exactly as we would like. We feel very good about the third quarters. It should be the biggest quarter of the year for us and I think it's all looking exactly as we had hoped. We are aware that other companies have missed, but there was one particularly one today. It has nothing to do with us, and I would like to say, it's a question of expectations.
>
> Our expectations, and what we try to guide the Street towards in our - is realistic and well within the bounds of the abilities of our business, and so I'm not sure that things are necessarily bad for other people. It's just that maybe the expectation are too high. So that's your world, not mine. But I don't think that there's anything wrong with retail. I think the consumer is there, and thankfully, they seem to be buying our product, which is what the game's all about.

Compl. ¶39.

From July 7 through August 3, 2005, Jarden's common stock traded at or above the $56 trading price required to trigger Jarden's right to convert the Series B preferred stock into common stock. The Series B stock had been issued to fund the AHI acquisition, but that stock restricted Jarden's ability to raise funds for additional acquisitions.

On August 1 and 2, 2005, Defendant Franklin sold 126,000 shares of his Jarden stock for proceeds of more than $4.8 million, and Defendant Ashken sold 135,000 shares for proceeds of more than $5.1 million.

On August 8, 2005, Jarden announced that it had exercised its right to convert the Series B preferred stock into common stock, to be effective August 14, 2005, which would eliminate Jarden's responsibility to pay dividends on the preferred stock. Compl. ¶43.

Plaintiffs allege that by October of 2005, Holmes was feeling the effects of Hurricanes Katrina and Rita, and that the concern over the impact of these storms on sales was a serious concern to Andy Hill at JCS, and was the subject of memoranda issued by executives at Holmes to Andy Hill, at his request. Compl. ¶33.

On October 27, 2005, Jarden issued a press release, announcing its financial results for the three and nine months ending September 30, 2005, in which Defendant Franklin was quoted as stating:

> Our businesses produced another record quarter. Our strong operating performance in the face of tough macro economic conditions shows the resilience of our diversified portfolio of brands and markets has paid off. These positive results were driven by organic growth in our Consumer Solutions and Outdoor Solutions segments, coupled with continuing synergy programs across all of our business segments....We are confident that our cash flow and other financial goals for 2005 should be achieved, which sets a platform for further success in 2006.

Compl. ¶46.

During an earnings conference call also held on October 27, 2005, Defendant Franklin stated that "[a]t this point we see the strong sales performance in Q3 continuing into Q4, and expect to meet or exceed the Street's revenue and cash flow expectations for Q4." Compl. ¶47. During that call Defendant Ashken stated that:

> Based on the cash flow pattern in previous years and the strong start to the seasonally strong cash flow period of September 1st through January 31st, we believe we will comfortably exceed the second-half forecast, with over $200 million of cash flow from operations in Q4.

*Id.* During the call, in response to an analyst's question about what provided confidence for expected strong cash flow Q4, Ashken stated:

7

>I think two things, Charlie. One is, obviously, we have the advantage of the [sic] seeing the pattern of our American Household and Holmes business' cash flow in 2004, which the markets don't. And we are really trending exactly - in fact, a little bit ahead of where we expected to be at this time. And given that this is driven by revenue and collecting receivables during Q4, that's why we feel comfortable with not only the historical patterns but what's actually going on in October.

*Id*. When asked about the strength of the year's crock-pot sales, Ashken replied that it was "going just fine." *Id*.

On October 27, 2005, the price per share fell by $3.30, from $35.56 (at the prior day's close), to $32.26 (about 9%).

On November 2, 2005, in response to the decline, Defendants commented at an Analysts Day meeting, and Defendant Ashken stated:

>[W]e run this company for cash flow. And the reason we do is that the fuel that drives the growth business allows us to reinvest in our brands. And also to fund acquisitions while keeping our focus at EBITDA within our 3.5 times goals. We have attractive EBITDA margins.
>...
>If we look in a little bit more detail at Q4, 2004 cash flow and what this slide shows is you can take the actual Jarden cash flow from operations, which is $42 million last year in Q4 and you just simply aggregate without backing out any of the adjustments what the cash flow from operations was for Holmes and American Household at Q4 of last year, you come up with a total of $170 million.

Compl. ¶51.

After the November analysts meeting, at least one analyst reported "coming away increasingly encouraged by the prospects for the company over the next year and comfortable in our above-mean EPS for 2006." The analyst stated a belief that "the company's guidance is not

8

only achievable but conservative," based upon management's presentation as to why it was "so comfortable in achieving $200 million in cash from operations in 4Q05." Compl. ¶52.

On November 4, 2005, Defendant Franklin sold 281,000 shares of Jarden common stock for proceeds of more than $2.8 million, and Defendant Ashken sold 31,500 shares for proceeds over $1.1 million.

> On January 12, 2006, Franklin stated in a conference call that:
>
> > [O]ur Holmes and FoodSaver businesses did not meet expectations during the quarter. At the time of the Holmes acquisition in July 2005, we projected this business would contribute annualized adjusted EBITDA of approximately $95 million for 2005, with the vast majority of this in the second half of the year. Based on the sales mix and cost run rate in Q4, we now estimate this business will miss these projections by approximately $15 million.
> > ***
> > In hindsight, the original forecasts for Holmes provided to us at the time of the acquisition were over[-]optimistic.  This fact [covered] (sic) with the integration of entrepreneurial business such as Holmes during the busiest season resulted in a significant burden for the management and infrastructure of the business.  In short, during 2005, the business did not perform up to the level we expected it to.
>
> Compl. ¶54.  When asked by an analyst how Franklin would apportion blame between a lack of due diligence and a lack of execution, Franklin responded:
>
> > I take the blame.... They have much more – seat of pants is too - is not a charitable enough description, but it's much more driven by - had an entrepreneurial leader and had a less formal process than we're used to for planning.... And I think that it's just - with hindsight, I probably should have built more conservation into what we thought it would do rather than just relaying what they thought it would do.
>
> Compl. ¶55.  On January 12, 2006, Jarden also issued a press release, in which it stated:
>
> > During the fourth quarter, in aggregate, the results of our Branded Consumables, Outdoor Solutions and Other segments as well as our legacy Sunbeam business were ahead of last year and exceeded our forecast for the fourth quarter.  However, the two businesses being

> integrated into our Consumer Solutions segment, FoodSaver and Holmes, did not meet our expectations in the fourth quarter. That said, we view this as primarily a timing and integration issues and remain confident about both businesses, particularly regarding the synergies that we have yet to realize from the Holmes acquisition.

Compl. ¶57.

Following the January press release, Jarden's common stock fell by $3.37 per share to $27.05 (more than 11%).

Plaintiffs allege that the product and management synergies did not exist as represented to the market, that shortfalls within Holmes' aggressive sales and revenue projections were occurring well before the acquisition was finalized, that shortfalls continued through the class period, and that Defendants' representations to the contrary throughout the class period were materially false and misleading when made because they misrepresented and failed to disclose material adverse facts that they either knew or recklessly disregarded, namely: 1) that Holmes was experiencing declining demand for its products and was not meeting its internal sales projections; 2) that Jarden was therefore not likely to achieve the expected synergies from the Holmes acquisition; and 3) that Jarden would not be able to meet its projected results and cash flows due to the adverse factors then affecting Holmes' business. Compl.¶10.

Plaintiffs allege that while in possession of information showing that the synergies spoken of would *not* benefit Jarden, Jarden and the individual Defendants Franklin and Ashken sought to artificially inflate Jarden's stock price in order to convert a class of preferred stock to common stock, so as to eliminate certain restrictions on the Company's ability to raise funds.

They allege that insiders Franklin and Ashken were aware that Jarden's stock price was artificially inflated (due to false and misleading statements regarding the success of the Holmes acquisition), and that they gained millions of dollars in incentives keyed to Jarden's stock price, and sold substantial amounts of their stock holdings in the Company at artificially inflated prices.

Defendants argue that the Section 10(b) and Rule 10b-5 claim must be dismissed because Plaintiffs have failed to satisfy the basic pleading requirements of a Rule 10b-5 claim, by failure to allege any material misrepresentation or omission (and that the claim against JCS must be dismissed because there is no allegation that JCS made any representation at all). Defendants also assert that the Complaint fails to allege that any Defendant acted with scienter, and that Defendants had motive and opportunity to commit fraud; that the insufficiency of the underlying 10b-5 claim means that Plaintiff's control person claim under Section 20(a) of the Exchange Act must be dismissed as well; and that the Complaint does not allege loss causation in that there is no allegation that the Company's 2005 earnings release, which is alleged to have caused the Company's stock decline, made mention of the matters that Plaintiffs assert were misleading.

*Discussion*

When considering a motion to dismiss under Rule 12(b)(6), the Court is obliged to accept the well-pleaded assertions of fact in the complaint as true and to draw all reasonable inferences and resolve doubts in favor of the non-moving party. The focus of the Court's inquiry is not whether plaintiffs will ultimately prevail, but whether the claimant is entitled to an opportunity to offer evidence in support of the claims. Therefore, a motion to dismiss must be denied unless

it appears beyond doubt that the plaintiff can prove no set of facts in support of a claim which would entitle Plaintiff to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

> Our Court of Appeals has held that:
>
> [E]xpressions of puffery and corporate optimism do not give rise to securities violations. Up to a point, companies must be permitted to operate with a hopeful outlook: People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; **subject to what current data indicates**, they can be expected to be confident about their stewardship and the prospects of the business that they manage. To succeed on this claim, plaintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so.

*Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)(citations and quotations omitted)(emphasis added).

The PSLRA insulates corporate entities and persons from liability for forward-looking statements that prove to be incorrect. *See* 15 U.S.C.A. § 77z-2 (West 1997); David M. Brodsky & Daniel J. Kramer, *Federal Securities Litigation: Commentary and Forms* at 2-9 (1997). A forward-looking statement is insulated from liability under two circumstances: (1) where a forward-looking statement is accompanied by meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward-looking statement; or (2) where a forward-looking statement was made without knowledge that the statement was false or misleading. 15 U.S.C. §§ 78u-5(c)(1)(A)&(B).

Forward-looking statements are defined *inter alia* as projections, plans, or statements of future economic performance. 15 U.S.C. § 78u-5(i)(1). "It is well recognized that even when an

allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *In Re AOL Time Warner, Inc., Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 221 (S.D.N.Y. 2004) (Kram, J.)(quotations and citations omitted) (particular statements characterizing AOL's advertising and commerce revenue growth as "very healthy" were not forward-looking; they were not contingent on future events, nor were they projections about AOL's financial future–they were statements of the company's existing financial condition).

The Complaint bases much of its allegations on the accounts of two confidential witnesses who were purportedly high-level employees of Holmes, who believe that it was well known that the Holmes internal sales projections were no longer realistic at the time when the Holmes acquisition was announced, as Holmes had missed its sales projections by about $20 million at that time, and that this was known widely throughout Holmes by virtue of a software program called "SAP," which documented business, sales and forecasting data and was accessible by Defendants after the acquisition. By July of that year, Plaintiffs allege that Defendants participated in weekly meetings with Holmes executives, where Holmes' sales performance was reviewed in detail and that following the acquisition, Andy Hill, the CEO of JCS also attended weekly Results and Forecasts meetings.

Non-movants contend that the crucial issue in deciding this motion is "whether Defendants had a duty to disclose that the integration of Holmes' business was not having a positive effect on Jarden's financials." *Opposition at 8*. For purposes of this motion, the critical question is actually whether Defendants might have had such a duty in light of the several

positive statements made as to the Holmes acquisition.

While Defendants were permitted to remain optimistic about the future and to maintain a hopeful outlook, their public statements of optimism should have been subject to what the current data indicated. *See Rombach, supra*. Plaintiffs have adequately alleged that Defendants knew or should have known that Holmes was not experiencing the positive cash flow and sales as represented on several occasions with present tense descriptions such as: "the business [Holmes] has impressive cash flows;" "the third quarter ... is trending exactly as we would like;" "I think the consumer is there, and thankfully, they seem to be buying our product, which is what the game's all about;" "our businesses produced another record quarter;" "why we feel comfortable with ... what's actually going on in October;" and that sales were "going just fine."

Defendants argue that since Plaintiffs have not alleged that EBITDA projections for Holmes were ever publicly disseminated, such projections could not have been misrepresented. The Court disagrees. The statements in this case relied on both present and historical facts, and were not only forward-looking predictions. Plaintiffs allege that Defendants had access to revised projections during the due diligence period, that they knew or were reckless in not knowing that Holmes' sales fell $20 million short of its projections in early 2005, and that by August 2005, each division of Holmes was off by millions and it was feeling the effects of Hurricanes Katrina and Rita by October.

In October, Defendant Ashken replied that crockpot sales were going just fine, and that

Holmes cash flow in 2004 was trending exactly or even a little bit ahead of where they expected to be at that time.  This might have been materially misleading if he was then aware of what Defendant Franklin later explained, namely, that forecasts for Holmes provided to us at the time of the acquisition were over-optimistic and that during 2005, Holmes did not perform up to the level they expected it to perform.  Defendants may have known or recklessly disregarded the likelihood that certain statements as to Holmes' status and the likely effect of the acquisition were false or misleading.  *See e.g. In re Regeneron Pharmaceuticals Securities Litigation*, 94 Civ. 1785 (CLB), 1995 U.S. Dist. LEXIS 4023 (S.D.N.Y. March 10, 1995)(where defendants made specific statements that a drug was well-tolerated and produced few side effects, defendants were required to disclose interim study data indicating the contrary); *see also United Paperworkers International Union v. International Paper Co.*, 801 F.Supp. 1134, 1140 (S.D.N.Y. 1992)(proxy statement referencing the company's longstanding commitment to protecting the environment and its strong environmental compliance program were misleading where the company had a record of environmental non-compliance incidents).

Defendants, who do not "by usual custom" give "guidance to the Street," stated that with June drawing to a close, and given the size of the transaction, they wanted to give an overview of Jarden's Q2 outlook and the impact of the Holmes transaction on earnings for 2005.  Defendants were of course permitted to keep an optimistic outlook for the Q4 of 2005, but what might normally constitute appropriate forward looking statements such as that the "Holmes transaction should offer a number of synergies," when combined with statements of Holmes' present "impressive cash flows" and similar statements, could result in liability if any or all of the

statements are proved to have been intentionally misleading or made with reckless disregard as to their accuracy.  Indeed, Defendant Franklin, who in June of 2005, stated that he and Defendant Ashken had employed due diligence with a hands-on approach and had kicked the tires, etc., ultimately took the "blame" for "just relaying what they [Holmes] thought it would do."  This could go to showing reckless disregard for Holmes' actual financials and likely impact on Jarden.

*Scienter*

Contrary to Defendants' contention, the Plaintiffs have sufficiently plead with particularity facts giving rise to a "strong inference" that Defendants acted with scienter, as required under Section 78u-4(b)(2) of the PSLRA.  To plead scienter adequately, plaintiffs must allege facts to support a strong inference of "an intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n.12; *see Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); 15 U.S.C. § 78u-4(b)(2). "Such intent can be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-9 (2d. Cir. 2000) (*quoting Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

Our Court of Appeals has ruled that, "in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000).  *See also In re Time Warner Inc. Securities Litigation*, 9

F.3d 259, 270 (2d Cir. 1993) (pleading that a company allowed prior statements to become misleading by material nondisclosure of the company's active consideration of a rights offering, in order to maintain a high stock price before announcing the new offering, was a sufficient pleading of motive); *cf. Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 & n.2 (2d Cir. 1982) (sufficient evidence supported a jury's finding of defendants' fraudulent intent to overstate inventory, including evidence showing that the company benefitted from overstated inventory where the stock price followed rising reported earnings, which enabled the company to make numerous acquisitions after a five-for-one split).

Plaintiffs adequately alleged scienter in that Defendants could have been motivated to artificially inflate the stock price in order to convert a class of preferred stock to common stock, so as to lift restrictions on the Company's ability to raise funds, and that in that the Individual Defendants gained millions of dollars in incentive payments keyed to Jarden's stock price performance. And even if ultimately proved to have been innocent, there is at least curiously coincidental timing of the Individual Defendants' sales of substantial portions of their personal holdings in Jarden common stock, which sales generated millions of dollars of proceeds. Compl. ¶¶12, 75-77, 79-80.

*Loss Causation*

The Court also disagrees with Defendants' contention that Plaintiffs failed to adequately plead loss causation. Plaintiffs claim that the Plaintiffs and class members were damaged by the

17

purchase of common stock at artificially inflated prices and that this resulted in damages when the price of Jarden common stock declined after the alleged misrepresentations and/or fraudulent omissions made to the market, and the effects thereof, were revealed, first in October of 2005, when the price per share fell by 9 percent, and again when the price per share fell by about 11 percent, in January of 2006. Compl. ¶¶ 27, 69-70.

While Plaintiffs may not ultimately prevail on the merits with a developed record, the Court concludes that Plaintiffs have stated a claim upon which relief might be granted. The Court declines at this time to dismiss the charges as against JCS, but may see fit to do so on a more complete record. Accordingly, Defendants' motion to dismiss (Doc. 28) is denied. A status conference with counsel will be held by the Court on July 20, 2007 at 10:00 a.m.

X

                            X

                                          X

SO ORDERED.

Dated: White Plains, New York
       May 31, 2006

SO ORDERED.

Dated: White Plains, New York
       May 31, 2006

                                                                                                        *Charles Brieant*
                                                                                Charles L. Brieant, U.S.D.J.